**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

GWYNETH GILBERT and MICHAEL
MARTE, on behalf of themselves
and the Putative Class,

            Plaintiffs,

      v.

LANDS' END, INC.,

            Defendant.

Civil Action No. 3:19-cv-00823-jdp

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**<u>MOTION TO STRIKE CLASS ALLEGATIONS</u>**

U. Gwyn Williams (*pro hac vice*)
Samuel Townsend (*pro hac vice*)
Jeremiah Cowen (*pro hac vice*)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, Massachusetts 02116
Telephone: 617.948.6000
Facsimile: 617.948.6001
gwyn.williams@lw.com
samuel.townsend@lw.com
jeremiah.cowen@lw.com

*Attorneys for Defendant Lands' End, Inc.*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ................................................................................................2

ARGUMENT .......................................................................................................................5

I.    The Class Claims Are Fatally Flawed And Should Be Struck ...............................5

    A.    Fatally Deficient Class Allegations Can – And Should – Be Struck ........5

    B.    Plaintiffs' Class Allegations Are Fatally Deficient .................................6

        1.    The Proposed Class Is Overbroad Because It Includes Predominantly Uninjured Members ...........................................7

        2.    Individual Issues Of Fact and Law – Especially Causation, Injury, and Liability – Predominate Over Common Issues ..................................10

            a.    The Delta Uniform Pieces Themselves Are Individualized and Widely Disparate ...................................................11

            b.    The Putative Class Members, and Their Uses Of The Delta Uniform, Vary Widely and Require Individualized Inquiry Into Causation and Injury ......................................13

            c.    The Alleged Injuries Are Common, Subjective, and Determinable – If At All – Only Through Highly Individualized Inquiry ...................................................16

            d.    The Property Damage Claims Are Subject To The Same Predominance Issues and Have No Class Representative ...........18

            e.    Supreme Court, Federal Appellate, and Seventh Circuit Practice and Precedent Come To The Same Conclusion...............18

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alqaq v. CitiMortgage, Inc.*,
2014 WL 1689685 (N.D. Ill. Apr. 29, 2014) ............................................................. 6

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .................................................................................... *passim*

*Arango v. Work & Well, Inc.*,
2012 WL 3023338 (N.D. Ill. July 24, 2012) ............................................................ 6

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) ............................................................................... 8

*Avritt v. Reliastar Life Insurance Co.*,
615 F.3d 1023 (8th Cir. 2010) ........................................................................... 8

*Bd. of Educ. of Tp. High School v. Climatemp, Inc.*,
1981 WL 2033 (N.D. Ill. Feb. 20, 1981) ................................................................ 6

*Belfiore v. Procter & Gamble Co.*,
94 F.Supp.3d 440 (S.D.N.Y. 2015) ................................................................... 19

*Bell Atlantic Corp. v. ATT Corp.*,
339 F.3d 294 (5th Cir. 2003) ............................................................................. 9

*Block v. Abbott Labs.*,
2002 WL 485364 (N.D. Ill., Mar. 29, 2002) ........................................................ 16

*Bohn v. Boiron, Inc.*,
2013 WL 3975126 (N.D. Ill. Aug. 1, 2013) ............................................................ 6

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) ......................................................................... 19

*Buonomo v. Optimum Outcomes, Inc.*,
301 F.R.D. 292 (N.D. Ill. 2014) ......................................................................... 6

*Cholly v. Uptain Group, Inc.*,
2017 WL 449176 (N.D. Ill. Feb. 1, 2017) ............................................................. 6

*Colley v. Procter & Gamble Co.*,
2016 WL 5791659 (S.D. Ohio Oct. 4, 2016) ......................................................... 9

ii

*Conrad v. Boiron, Inc.*,
869 F.3d 536 (7th Cir. 2017) ...................................................................18

*Cook County College Teachers Union v. Byrd*,
456 F.2d 882 (7th Cir. 1972) ....................................................................5

*DeCrescentis v. Lands' End, Inc.*,
Civ. No. 19-cv-4717 (LGS) (S.D.N.Y) .....................................................2

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)......................................................................8

*Durocher v. NCAA*,
2015 U.S. Dist. LEXIS 41110 (S.D. Ind. Mar. 31, 2015)............................1, 6, 19

*Equal Rights Center v. Kohl's Corp.*,
2015 WL 3505179 (N.D. Ill. June 3, 2015) ...............................................6

*Gen. Tel. Co. of the Southwest v. Falcon*,
457 U.S. 147 (1982)..................................................................................9

*Hill v. Wells Fargo Bank, N.A.*,
946 F. Supp. 2d 817 (N.D. Ill. 2013) .....................................................5, 6

*Isaacs v. Sprint Corp.*,
261 F.3d 679 (7th Cir. 2001) ...................................................................20

*Jones v. Allercare*,
203 F.R.D. 290 (N.D. Ohio 2001) ...........................................................19

*Kasalo v. Harris & Harris, Ltd.*,
656 F.3d 557 (7th Cir. 2011) ..................................................................5, 7

*Kemp v. Metabolife Int'l, Inc.*,
2002 U.S. Dist. LEXIS 2435 (E.D. La. Jan. 25, 2002).............................19

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
571 F.3d 672 (7th Cir. 2009) .................................................................8, 9

*Ladik v. Wal-Mart Stores, Inc.*,
291 F.R.D. 263 (W.D. Wis. 2013) ............................................................6

*Loreto v. Procter & Gamble Co.*,
2013 U.S. Dist. LEXIS 162752 (S.D. Ohio Nov. 15, 2013).......................9

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)...................................................................................8

*McCaster v. Darden Restaurants, Inc.*,
845 F.3d 794 (7th Cir. 2017) ................................................................................9

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ...........................................................................9, 10

*Miller v. Motorola, Inc.*,
76 F.R.D. 516 (N.D. Ill. 1977)..............................................................................7

*In re PPA Prods. Liab. Litig.*,
208 F.R.D. 625 (W.D. Wash. 2002) ....................................................................17

*Pilgrim v. Universal Health Card, LLC*,
660 F.3d 943 (6th Cir. 2011) ..........................................................................6, 20

*In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*,
2013 WL 3791509 (S.D. Ill. July 18, 2013) ..........................................................6

*Pumputiena v. Deutsche Lufthansa, AG*,
2017 WL 66823 (N.D. Ill. Jan. 6, 2017) ..............................................................6

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013).............................................................................8

*In re Rezulin Prods. Liab. Litig.*,
210 F.R.D. 61 (S.D.N.Y. 2002) .....................................................................17, 19

*In re Rhone-Poulenc Rorer Inc.*,
51 F.3d 1293 (7th Cir. 1995)..............................................................................19

*Shepherd v. ASI, Ltd.*,
295 F.R.D. 289 (S.D. Ind. 2013)..........................................................................18

*Stanek v. Saint Charles Community Unit School District No. 303*,
2017 WL 5971985 (N.D. Ill. Dec. 1, 2017)...........................................................6

*Stearns v. Select Comfort Retail Corp.*,
763 F.Supp.2d 1128 (N.D. Cal. 2010) ..................................................................8

*Szabo v. Bridgeport Machines, Inc.*,
249 F.3d 672 (7th Cir. 2001) ..............................................................................20

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S.Ct. 1036 (2016)........................................................................................17

*Wolfkiel v. Intersections Ins. Servs. Inc.*,
2014 WL 866979 (N.D. Ill. Mar. 5, 2014)............................................................6

iv

*Wright v. Family Dollar, Inc.*,
2010 WL 4962838 (N.D. Ill. Nov. 30, 2010) ...................................................................5, 6

*In re Yasmin & Yaz (Drospirenone) Mktg.*,
275 F.R.D. 270 (S.D. Ill. 2011) ................................................................ *passim*

## RULES

Fed. R. Civ. P. 12(f) ................................................................................................1, 5, 6

Fed. R. Civ. P. 23 ....................................................................................................1, 5, 8

Fed. R. Civ. P. 23(b)(3) ...........................................................................................10, 18

Fed. R. Civ. P. 23(c)(1)(A) ........................................................................................1, 5

Fed. R. Civ. P. 23(d)(1)(D) ........................................................................................1, 5

## OTHER AUTHORITIES

https://www.flickr.com/photos/deltanewshub/albums/72157667190842167) ...............................4

https://www.flickr.com/photos/deltanewshub/albums/72157693938361602) ..............................4

https://www.flickr.com/photos/deltanewshub/sets/72157695193544321/)...................................4

(https://www.flickr.com/photos/deltanewshub/albums/72157667190981317)..............................4

## INTRODUCTION

Plaintiffs have brought this case on behalf of all Delta Air Lines, Inc. ("Delta") flight attendants, gate agents, and ramp agents who wore Delta uniforms manufactured by Lands' End, Inc. ("Lands' End"), alleging that a class will be appropriate even though they seek to recover compensatory damages for a wide variety of personal injuries and property damage, and despite that many of the purported class members suffered no injury at all.  Such a class could never be certified, and this Court should use the powers granted it by Rules 12(f), 23(c)(1)(A), and 23(d)(1)(D) to strike the class allegations.

This Court need not – and should not – await full class certification briefing to exercise its powers, as multiple defects in the class allegations are plain from the face of the Complaint.  First, the proposed class is facially overbroad as it includes Delta employees who have suffered no injury whatsoever and thus have no standing to sue.  Second, Delta employees who allege they suffered medical problems as a result of wearing the uniforms have no chance of obtaining class status, given the virtually unanimous recognition among federal courts that personal injury cases are not suitable for class certification due to the inevitable predominance of individual issues over common ones.[1]  Third, and for similar predominance of individual issue reasons, class certification will not be appropriate for the Delta employees alleging that dye transfer from the uniforms stained their clothes, skin, or bedding.  The proposed class would also fail other Rule 23 requirements – including typicality and ascertainability – but this Court need never even reach that more detailed level of class certification analysis, as the flaws apparent from the face of the Complaint give ample grounds to simply strike the class allegations at the pleading stage of the case.

---

[1] *See, e.g., Durocher v. NCAA*, 2015 U.S. Dist. LEXIS 41110, *33-34 (S.D. Ind. Mar. 31, 2015) (collecting cases, noting that "no federal appellate court has approved a nationwide personal injury, product liability or medical monitoring class," and granting a motion to strike personal injury class allegations).

## FACTUAL BACKGROUND

Since May of 2018, Delta Air Lines has required approximately 64,000 of its employees to wear "Passport Plum or similar red-colored uniforms" manufactured by Lands' End. Compl. ¶¶ 4, 16, 45. Plaintiffs purport to represent a nationwide class of all such employees,[2] based on allegations that the Delta uniform garments cause physical injury (in the forms of skin rashes, headaches, fatigue, breathing difficulties, hair loss, low white blood cell count, nausea, heart palpitations, body aches, sore throats, scarring, and "getting sick") and property damage (in the form of dye crocking and bleeding, causing staining). *Id.* ¶¶ 2, 20, 21, 23, 34, 41. Plaintiffs seek, among other remedies, compensatory damages. *Id.* ¶¶ 55, 65, 70, 82, 91, 101, 112.

The facts, even as alleged, amply demonstrate numerous divergences between the putative class members. First, of the tens of thousands of Delta employees wearing the Delta uniform pieces, Plaintiffs allege that a relatively small number have suffered personal injury. *Id.* ¶¶ 2, 20, 21, 26 (alleging variably that "some," "hundreds," or "1,900" have suffered personal injuries).[3] Even less certain is the scope of the property damage claims, particularly given that *neither named Plaintiff alleges such harm themselves*. Indeed, aside from a general allegation about "crocking and bleeding," *see, e.g.*, *id.* ¶ 2, there is no specific factual allegation anywhere in the Complaint about property damage. Further, as Plaintiffs' sole conclusory allegation of crocking and bleeding is limited to the "Passport Plum uniforms," the Complaint does not include any allegation whatsoever that any of the other colors of clothing have caused any property damage. *Id.*

---

[2] Plaintiff Gwyneth Gilbert, along with another Delta employee and represented by the same counsel as here, sought to bring a similar action in the Southern District of New York. *See* Complaint, *DeCrescentis v. Lands' End, Inc.*, Civ. No. 19-cv-4717 (LGS) (S.D.N.Y.). For personal jurisdiction reasons, that court limited the case to New York residents. Thereafter, Ms. Gilbert (Georgia resident) filed this action, along with co-Plaintiff Michael Marte.

[3] Plaintiffs do allege that some Delta employees may be afraid to complain about reactions to the uniforms, *id.* ¶ 26, but even still, Plaintiffs do not – and could not – allege that anything like *all* employees suffered physical injury.

2

Second, the Delta employees lumped together in the putative class are not similarly situated.  As an initial matter, the putative class includes two entirely separate categories of employees: those whose roles are primarily indoors and customer-facing (known in the industry as "above-the-wing"), and those whose roles are primarily outdoors and physical or technical in nature (known as "below-the-wing").  *See id.* ¶¶ 14, 19.  Plaintiffs have not alleged any items of clothing are worn by both groups, and with good reason: these two groups of employees wear *entirely different uniform lines*.  *See id*.  And even within the broad categories – for example, gate agents and flight attendants are both "above-the-wing" employees – different jobs have different garments which the employees may select.  *Id.[4]*

Increasing the complexity further, within each job, the available garment choices then splinter by gender, with no items of clothing being available to both genders.  *Id.* ¶ 19.  Plaintiff Gilbert claims an allergic reaction to certain clothing items worn by female flight attendants, and Plaintiff Marte to clothing items worn by male ramp agents, but the named Plaintiffs have no product overlap with one another.  Moreover, this means there is no class representative for Delta employees who wear the male flight attendant items, female ramp agent items, or gate agent items for either gender.  Indeed, while the class purports to include gate agents, neither named Plaintiff is a gate agent and there are no factual allegations of any complaint by or injury to any gate agent.  *See id.* ¶¶ 20-26, 29, 40.  And, notwithstanding Plaintiffs' definition of the Uniforms as "Passport Plum or similar red-colored uniforms," *id.* ¶ 1, the colors of clothing actually available include, according to the Complaint itself, "Cruising Cardinal," "Groundspeed Graphite," thistle pink, red, black, "Passport Plum" (also called bright purple), purple, and more.  *Id.* ¶¶ 14, 19.

---

[4] For example, according to the Complaint, female gate agents may wear "a color-block dress with an accent of Cruising Cardinal or a purple pants suit" whereas female flight attendants may choose among "a v-neck dress, IFS Signature dress, skirt, pants, blouse, vest or blazer." *Id.* ¶ 19. A gate agent and a flight attendant of the same gender – even though within the same category – are alleged to overlap only in that each "get a warming sweater." *Id.*

To choose among these many options, the Complaint alleges that all (and only) "above-the-wing" Delta employees have the opportunity to try the clothing and to be fitted in a "fit clinic" operated by Delta.  *Id.* ¶ 18.  Based on their personal preferences and the fit clinic, Delta employees choose from the variety of articles of clothing, and Delta purchases chosen items for the employee. *Id.* ¶ 18.  Additional items are available for individual purchase by Delta employees, if "the employee wanted" for any reason to purchase them.  *Id.* ¶ 18; *see also id.* ¶ 29 (Plaintiff Gilbert, for example, purchased "a sweater set.").  Plaintiffs allege at least twenty different articles of clothing of different styles and colors are available to Delta employees, with different (and often non-overlapping) sets being available to individual employees based on job description, job category, and gender.  *See id.* ¶¶ 14, 18, 19.  In short, no item, style, or color of clothing is available to – much less chosen and worn by – every Delta employee within the putative class.[5]

The alleged personal injuries are nearly as varied as the garments Plaintiffs allege cause them, and include skin rashes, headaches, fatigue, breathing difficulties, hair loss, low white blood cell count, nausea, heart palpitations, body aches, sore throats, scarring, and "getting sick." *Id.* ¶¶ 2, 20, 21, 23, 34, 41. The named Plaintiffs do not themselves allege all of these symptoms – for example, they have not suffered from breathing difficulties, hair loss, low white blood cell count, nausea, and heart palpitations.  *Id.* ¶¶ 22, 29-44.  The injuries the named Plaintiffs do claim to have suffered are alleged to be the result of specific allergies:  Plaintiff Gilbert alleges that she is "highly allergic" to  "disperse dyes" and formaldehyde, and Plaintiff Marte that he "has a contact allergy

---

[5] Some of the items available to and worn by members of the putative class may be viewed in Delta's Flickr albums, which are available online. Four such albums are available at the following addresses: Uniform Group Shots 2018 (https://www.flickr.com/photos/deltanewshub/sets/72157695193544321/); Flight Attendant Uniforms 2018 (https://www.flickr.com/photos/deltanewshub/albums/72157667190842167); Airport Customer Service Uniforms 2018 (https://www.flickr.com/photos/deltanewshub/albums/72157693938361602); and Ramp Uniforms 2018 (https://www.flickr.com/photos/deltanewshub/albums/72157667190981317).

with Dimethylol dihydroxy ethylene urea." *Id.* ¶¶ 37, 44.  Plaintiffs do not allege that these specific allergies are shared with each other or any other putative class member, or that the same allergies caused all the varying personal injuries.

## ARGUMENT

### I.     The Class Claims Are Fatally Flawed And Should Be Struck

#### A.     Fatally Deficient Class Allegations Can – And Should – Be Struck

Motions to strike class allegations under Rule 12(f), which gives courts the power to "strike from a pleading … any redundant, immaterial, impertinent, or scandalous matter," are appropriate when the deficiencies in the "pleadings make clear that the suit cannot satisfy Rule 23." *Hill v. Wells Fargo Bank*, N.A., 946 F. Supp. 2d 817, 830 (N.D. Ill. 2013); *see also Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011) ("[A] court may deny class certification even before the plaintiff files a motion requesting certification"); *Cook County Coll. Teachers Union v. Byrd*, 456 F.2d 882, 885 (7th Cir. 1972) ("One opposing a class action may move for an order determining that the action may not be maintained as a class suit.").

Courts are called to determine "at an early practicable time after a person sues … as a class representative … whether to certify the action as a class action."  Fed. R. Civ. P. 23(c)(1)(A). "[G]iven that Rule 23(c)(1)(A) instructs courts to determine whether a class may be certified '[a]t an early practicable time,' courts may—and should—address the plaintiff's class allegations when the pleadings are facially defective and definitively establish that a class action cannot be maintained." *Wright v. Family Dollar, Inc.*, 2010 WL 4962838, at *1 (N.D. Ill. Nov. 30, 2010). Consistent with these purposes, Rule 23(d)(1)(D) authorizes court "orders that … require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly."

Rule 12(f) motions are regularly used as the vehicle to accomplish this legislative purpose in the Seventh Circuit.[6]  This practice is not new: as the Northern District of Illinois noted nearly 40 years ago, "a number of courts in this circuit have employed it" for exactly this purpose.  *Bd. of Educ. of Tp. High School v. Climatemp, Inc.*, 1981 WL 2033, at *2 (N.D. Ill. Feb. 20, 1981) (citing cases).  Motions to strike class allegations "bring into focus issues the resolution of which governs the broader question of whether a class action is maintainable," "in order to expedite the administration of justice and to prevent abuse of its process." *Id.*

## B.     Plaintiffs' Class Allegations Are Fatally Deficient

Plaintiffs' pleadings "are facially defective and definitively establish that a class action cannot be maintained" on at least two grounds.  *See Wright v. Family Dollar, Inc.*, No. 10 C 4410, 2010 WL 4962838, at *1 (N.D. Ill. Nov. 30, 2010).  First, the putative class is overbroad in that it comprises numerous putative members who are not in fact injured or even alleged to be injured. Second, the individual issues for resolution would necessarily predominate over common ones.

As "no amount of time or discovery can cure these deficiencies," the class allegations are ripe for a motion to strike.  *In Re Yasmin and Yaz Marketing*, 275 F.R.D. 270 (S.D. Ill. 2011); *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943 (6th Cir. 2011) (granting a motion to strike where the claims as pleaded "preclude class certification" and no "proffered or potential factual development offers any hope of altering that conclusion"); *Miller v. Motorola, Inc.*, 76 F.R.D. 516,

---

[6] *See, e.g.*, *Stanek v. Saint Charles Community Unit School District No. 303*, 2017 WL 5971985 (N.D. Ill. Dec. 1, 2017); *Cholly v. Uptain Group, Inc.*, 2017 WL 449176 (N.D. Ill. Feb. 1, 2017); *Pumputiena v. Deutsche Lufthansa, AG*, 2017 WL 66823 (N.D. Ill. Jan. 6, 2017); *Equal Rights Center v. Kohl's Corp.*, 2015 WL 3505179 (N.D. Ill. June 3, 2015); *Durocher v. NCAA*, 2015 U.S. Dist. LEXIS 41110 (S.D. Ind. Mar. 31, 2015); *Alqaq v. CitiMortgage, Inc.*, 2014 WL 1689685 (N.D. Ill. Apr. 29, 2014); *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292 (N.D. Ill. 2014); *Wolfkiel v. Intersections Ins. Servs. Inc.*, 2014 WL 866979 (N.D. Ill. Mar. 5, 2014); *Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817 (N.D. Ill. 2013); *Bohn v. Boiron, Inc.*, 2013 WL 3975126 (N.D. Ill. Aug. 1, 2013); *In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, 2013 WL 3791509 (S.D. Ill. July 18, 2013); *Ladik v. Wal-Mart Stores, Inc.*, 291 F.R.D. 263 (W.D. Wis. 2013); *Arango v. Work & Well, Inc.*, 2012 WL 3023338 (N.D. Ill. July 24, 2012); *In re Yasmin & Yaz (Drospirenone) Mktg.*, 275 F.R.D. 270 (S.D. Ill. 2011); *Wright v. Family Dollar, Inc.*, 2010 WL 4962838 (N.D. Ill. Nov. 30, 2010).

518 (N.D. Ill. 1977) (granting a motion to strike where the class definition was "overbroad for a variety of reasons"); *Kasalo*, 656 F.3d at 563 (noting that courts have an "independent obligation to decide whether an action brought on a class basis can be maintained" and may even act *sua sponte*, particularly where "discovery would not be useful in resolving the class determination").

### 1. The Proposed Class Is Overbroad Because It Includes Predominantly Uninjured Members

Plaintiffs allege two forms of injury: (1) personal injuries such as skin rashes, headaches, and difficulty breathing and (2) damage to personal property through dye transfer.  Compl. ¶ 2.  In bringing their claims, Plaintiffs propose a vast class comprising "[a]ll flight attendants, gate agents and ramp agents employed by Delta in the United States who were required to wear Passport Plum and red-colored uniforms manufactured by Defendant."  Compl. ¶ 44.  But, as is clear from the face of the Complaint, this proposed class is "overbroad for a variety of reasons which are based on undisputed facts" – namely that the vast majority of Delta employees required to wear the uniforms have no actual or alleged injury and no standing to sue.  *See Miller*, 76 F.R.D. at 518.

Plaintiffs do not allege, nor could they, that all or most members of the proposed class have suffered either form of injury.  Indeed, the Complaint expressly acknowledges that they did not. *See, e.g.*, Compl. ¶ 20 ("some female flight attendants" reported illness), ¶ 21 ("hundreds of flight attendants" complained about illness on a private Facebook page with several thousand members), ¶ 25 ("some flights attendants" were told they could request disability job accommodation), ¶ 26 (alleging "1,900" employees, or less than 3% of the number of Delta employees Plaintiffs purport to represent, have complained to Delta about the uniform they have worn daily since May 2018); ¶ 2 (only alleging the Passport Plum color to be capable of causing property damage).

Indeed, beyond the Plaintiffs' admissions that the vast majority of the putative class is uninjured, many putative class members simply "could not have been injured."  *Kohen v. Pac. Inv.*

*Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009). For example, if only the purple Passport Plum items are alleged to bleed and cause staining, then none of the ramp agents – who do not have any purple Passport Plum garments in their uniform line – could have suffered the claimed property damage. Similarly, there is no allegation that the specific causes of personal injury to the named Plaintiffs – alleged to be specific allergies to specific compounds diagnosed following medical examination – are anything other than unique to each named Plaintiff, much less that every putative class member has the capacity to be so injured, much less still an actual injury. Compl. ¶¶ 37, 44. If, in fact, every (or even most) Delta employee suffered physical reactions when the new uniform line was rolled out in May 2018, the scope of such reactions would hardly be a secret given that class members are highly visible employees of the second largest airline in the world.

The inclusion of uninjured Delta employees makes Plaintiffs' putative class untenable. Rule 23 must be interpreted consistently with Article III, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997), and Article III requires individual plaintiffs to suffer an injury-in-fact that is caused by a defendant's alleged wrongdoing, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Lacking an "injury in fact," the vast majority of Plaintiff's putative class lacks Article III standing. *See Lujan*, 504 U.S. at 560. Because "no class may be certified that contains members lacking Article III standing," Plaintiffs' proposed class cannot be certified without a class-wide injury. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006);[7] *Stearns v. Select Comfort Retail Corp.*, 763 F.Supp.2d 1128, 1151 (N.D. Cal. 2010) (granting motion to strike because not

---

[7] *See also In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018) (rejecting class certification where "any class member may be uninjured, and there are apparently thousands who in fact suffered no injury"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252, 255 (D.C. Cir. 2013) (requiring that "all class members were in fact injured" and remanding because "false positives" within the plaintiffs' "damages model" include persons who have not been injured and "detects injury where none could exist"); *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) (holding a law permitting injured plaintiffs to bring class actions on behalf of uninjured individuals was "inconsistent with the doctrine of standing"); *Bell Atlantic Corp. v. ATT Corp.*, 339 F.3d 294 (5th Cir. 2003) (denying class certification, in part, because "it is not difficult to conceive of a business that would fall within the definition …, but that would nevertheless not have suffered any economic injury").

all consumers in proposed class had suffered injury); *Loreto v. Procter & Gamble Co.*, 2013 U.S. Dist. LEXIS 162752, at *12 (S.D. Ohio Nov. 15, 2013) (noting that a class is "overbroad if it includes significant numbers of consumers who have not suffered any injury or harm"); *see also Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982) (noting the "potential unfairness to the class members bound by the judgment if the framing of the class is overbroad").[8]

*Colley v. Procter & Gamble Co.*, 2016 WL 5791659 (S.D. Ohio Oct. 4, 2016), is particularly instructive. Plaintiff sought to represent a class of all purchasers of Old Spice deodorant products, claiming that some users had experienced adverse health effects such as chemical burns and permanent scarring. The court found the personal injury class could not possibly be certified, no matter what discovery revealed, and granted a motion to strike class action allegations. As pleaded, the class was held facially overbroad given that it included significant numbers of consumers who had suffered no injury and thus had no Article III standing. *Id.* at *8. But if the class were redefined to include only those consumers who did suffer personal injury, the class would amount to a "fail-safe" class (i.e., a class that cannot be defined until the case is resolved on the merits) and would not be ascertainable by objective criteria. *Id.* at *4.[9]

---

[8] Although Seventh Circuit courts have sometimes taken an approach that permits inclusion of small numbers of "persons who have not been injured" in a class – noting that this is "almost inevitable because at the outset of the case many of the members of the class may be unknown" – they are clear that "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury." *Kohen*, at 677. Plaintiffs do not propose a *de minimis* number of uninjured class members. The putative class consists almost entirely of uninjured Delta employees and even "persons who could not have been injured," as described above. *Id.*; *compare Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 826 (7th Cir. 2012) (declining to find a class definition overbroad for "minor overbreadth problems" where "only about 2.4 percent of the putative class members" were uninjured) .

[9] A "fail-safe" class is a class that "is defined so that whether a person qualifies as a member depends on whether the person has a valid claim" and is impermissible because "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 799 (7th Cir. 2017). The putative class would be fail-safe if defined, for instance, to include only Delta employees who suffered injury caused by Delta's uniform, as proving class membership would establish liability and, conversely, employees not establishing liability would by definition not be class members. The Seventh Circuit has noted the difficulties in "[d]efining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012)

Plaintiffs' claim that the proposed class is "composed of an easily ascertainable, self-identifying set of individuals and entities" simply misses the point where they have failed to construct a properly limited class.  Compl. ¶ 46.  An undifferentiated class comprising each Delta employee may be ascertainable, but it is vastly overbroad.  As discussed above, the class must be limited to injured employees.  As discussed below, this would be an enormously complex exercise requiring specific, individualized inquiry and resolution.

### 2. Individual Issues Of Fact and Law – Especially Causation, Injury, and Liability – Predominate Over Common Issues

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc.*, 521 U.S. at 623.  Plaintiffs' putative class is deeply fractured and varied.  The enormous variation in class members' personal characteristics, uses of the Delta uniform, alleged injury (or lack thereof), and even the very products that constitute each putative class member's uniform, make it impossible that common issues of causation and injury could ever "predominate over any question affecting only individual members." Rule 23(b)(3).

Plaintiffs ask the Court to determine which of the tens of thousands of putative class members have had, since May of 2018, any of the alleged symptoms – including common "skin rashes, headaches, fatigue" and "getting sick" – and to connect every such symptom to the various Delta uniform items worn by that particular class member.  Liability would necessarily turn on determinations of the existence and causation of putative class members' injuries.  This would entail, at a minimum, "(1) an examination of each class member's medical history, including pre-existing conditions and use of other medications; [and] (2) an evaluation of potential alternate causes for the alleged injury."  *In Re Yasmin*, 275 F.R.D. at 276-77, 279 (granting a motion to strike class allegations due to "the predominance of individualized issues of fact and law").

The predominance of individualized issues in this case is even more pronounced than in *In Re Yasmin*. There, the putative class definition included only those who had purchased and used the same medicine, as prescribed by a physician, and suffered specific, rare, and objective conditions. *Id.* at 272. Plaintiffs' putative class, the Delta uniform garments worn by each class member, each class member's uses of the Delta uniform, and the alleged injuries and damages, are much more varied and individual than in *In Re Yasmin*.

The Supreme Court has made clear that precisely these kinds of variations make a group insufficiently cohesive. For example, a class could not be certified where "[c]lass members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods. Some class members suffer no physical injury or have only asymptomatic pleural changes, while others suffer from lung cancer, disabling asbestosis, or from mesothelioma. Each has a different history of cigarette smoking, a factor that complicates the causation inquiry." *Amchem Prods., Inc.*, 521 U.S. at 624. Such individualized factors – different products, used differently, for different amounts of time, resulting in different or no injuries, and the existence of other, individualized potential causes – hopelessly complicate and expand the questions of causation, injury, and liability and make class treatment impossible.

        a.     *The Delta Uniform Pieces Themselves Are Individualized and Widely Disparate*

The most fundamental and glaring obstacle to a common resolution of issues in this products liability action is that putative class members *use different products*. Given that these products differ meaningfully in chemical treatments, fabrics, dye, style, skin contact, intended use, and more, establishing causation would necessarily begin with an individualized catalogue of each item 64,000 employees have owned and worn since May 2018. Delta's uniform policy, and the intervening practices and choices of individual employees, make this task impossibly complicated.

These differences will go to the core of causation. Plaintiffs allege the dyes in the clothing may cause injury, *see, e.g.*, *id.* ¶ 37, but also acknowledge the many different colors Lands' End's clothing comes in, *see id.* ¶¶ 14, 19. Plaintiffs allege additives and finishes used to ensure high performance of clothing may cause injury, *see, e.g.*, *id.* ¶ 44, but the items constituting Delta's uniform include items designed for indoor work, outdoor work, and for all the various climates in which Delta operates. But these differences in materials, fabrics, colors, and chemical additives and treatments are not the only key causation inquiries that differ by item. The skin-contact profile of each item differs by item design, use, and by individual, and some articles are worn against the skin while others are outer layers (but, whether an individual item is worn against the skin or not is also subject to individual variation). *See id.* ¶ 44 (Plaintiff Marte began, at some point, wearing an undershirt of unspecified origin). Similarly, the "above-the-wing" Delta uniforms are, generally, more tightly fitted than the "below-the-wing" Delta uniforms (which are designed to comply with ANSI safety and sizing requirements), resulting in differing skin-contact profiles.

Not only does the *available* clothing differ within categories of employees and, even more substantially, across the above- and below-the-wing roles, but the *actual* set of clothing an employee chooses may well be unique. *See, e.g.*, Compl. ¶¶ 14, 18, 19. Not only do these choices vary by taste, but systematically by differences in environment. "Below-the-wing" employees work in, and dress for, extremely varied climates – compare Georgian and Wisconsin ramp agents, for example. The fact-finder's individualized inquiry must continue even past the set of clothing an employee *chooses*, because employees are free to (and do) mix and match at will. *See id.* ¶¶ 29, 30, 32, 34, 39 (describing at least 5 different outfits Plaintiff Gilbert alone has worn). Plaintiffs' allegations reveal individualized determinations will be crucial to evaluating causation and injury. *See Id.* ¶¶ 29-34 (Plaintiff Gilbert alleges the "Passport Plum" dress caused "sore throats,

headaches, body aches and fatigue" but not the rashes she alleges were caused by other items –
which items, in turn, are not alleged to have caused any of the same symptoms as the dress).
Gender doubles this complexity.  Men and woman work in each of these roles and choose from
distinct items of different styles, colors, materials, etc.  *See, e.g.*, *id.* ¶ 19.

        b.     *The Putative Class Members, and Their Uses Of The Delta
              Uniform, Vary Widely and Require Individualized Inquiry Into
              Causation and Injury*

The fact that Plaintiffs propose a product liability class for entirely different products would
be somewhat ameliorated if the putative class was otherwise homogenous.  However, the putative
class also lacks coherent personal characteristics to connect to a common question.  There is no
allegation of a common pre-existing medical condition, sensitivity, or any other common vector
of injury such that any portion of the inquiry could be common. *Compare In re Yasmin*, 275 F.R.D.
at 270, 276-77, 279 (finding no predominance even with all of these factors).  The named Plaintiffs
themselves allege different, individual allergies.  Compl. ¶¶ 37, 44.  There is no allegation that
these allergies, or any allergies, are common or anything other than unique to the named Plaintiffs.
Determining causation would require the finder of fact to review the medical records of each
putative class member and to subject each and every putative class member to medical
examinations, as the named Plaintiffs have had.  *See* Compl. ¶¶ 36, 37, 43, 44.

Compounding this individual variation, the putative class members use Delta's uniforms
in extraordinarily varied ways.  Even if Plaintiffs could plead a consistent class-wide sensitivity,
injury from exposure to chemicals is highly dependent on dose and duration, and the fact-finder
would need to evaluate the use profile of each Delta employee.  The following highlights only a
few distinctions between class members which require such individualized determinations.

The duration of exposure varies widely by role.  Gate agents, ramp agents, and flight
attendants have different shifts and wear their Delta uniforms for longer or shorter durations.

Among flight attendants, there is enormous variation in shift length depending on individual flight schedule. This exposure differs across roles, but *each Delta employee* would also have different exposure profiles, varying by the amount of time they have been employed by Delta, been in particular roles, or worn any particular item.

Exposure to the elements and pollutants varies widely by role. "Below-the-wing employees" work outdoors and are exposed to the elements and pollutants of an airfield, complicating the causation analysis and introducing a substantial difference from the "above-the-wing" employees. "Below-the-wing" employees also work in the many climates in which Delta operates, which affects the rate at which chemicals may be extracted from any particular item and the concentration of any resulting exposure.[10] "Above-the-wing" employees, by contrast, wear their uniforms in carefully insulated environments. Which is not to say "above-the-wing" employees are safe from indoor pollutants which may provide alternative causation – *e.g.* cleaning agents which may differ by airport, scented products, etc. – but only that these are entirely different from a ramp agent's exposure. Flight attendants uniquely compound their exposure to airborne chemicals (whether exogenous or from the Delta uniform) working in extremely recirculated air.

Care and handling of Delta's uniform varies widely by role and individual. Gate agents and ramp agents are exposed to different environments and contaminants in the course of their work, but at least each group comes home each night and may launder their clothing using consistent methods and on a regular schedule – compared to itinerant flight attendants who may have to launder their uniforms opportunistically. Tracking causation would require individual evaluation

---

[10] For example, Plaintiff Marte, a ramp agent in the warmer climate of Georgia, would be expected to sweat in his Delta uniform more frequently and in greater volumes than the employees he seeks to represent in northern climates, whose Delta uniforms are more frequently exposed to rain and snow.

of each of these factors which affect dye integrity, the concentration of chemicals in the Delta uniform over time, the exogenous substances to which the employees are exposed, and more.

Choice of Delta uniform items, and wear and care guidance, vary widely by individual. Each employee who used the "fit clinic" received individualized advice and instructions which would be relevant to their use, fit, and style, and would need to be evaluated for each putative class member. Compl. ¶ 18. The individualized advice was not limited to the "fit clinic," however, and Delta employees who complained through formal or informal channels received extensive individualized advice. *See, e.g.*, *id.* ¶ 25, 36, 43 (Delta "informed some flight attendants" they would need to request disability accommodations, Plaintiff Gilbert was assigned a dermatologist while Plaintiff Marte sought his own). Delta employees also received disparate advice from one another, from medical professionals, and from other third parties. *See, e.g.*, *id.* ¶ 21, 24.

Relatedly, Delta employees' responses to purported injuries vary broadly. The named Plaintiffs themselves provide striking examples of the highly individualized responses taken by and available to Delta employees; these two employees alone have received "custom" replacement items, filed workers' compensation claims at Delta's advice, gone on leave, been specially permitted to wear unique items, received replacement items, been allowed temporary or permanent accommodations to wear alternative items, worn non-uniform items, and sought advice, testing, and treatment, from dermatologists. *Id.* ¶¶ 32, 35-39, 43, 44. Plaintiff Gilbert was able to receive permission from Delta to wear different clothes, *resolving her symptoms*. *Id.* ¶¶ 38, 39. Even before that time, she (and Plaintiff Marte) engaged self-help remediation. *See, e.g.*, *id.* ¶¶ 30, 34, 44 (alleging Plaintiff Gilbert changed items multiple times, *changing her symptoms*, and that Plaintiff Marte wore unidentified undershirts). The finder of fact would need to inquire into each Delta employee's entire history and practice of wearing the Delta uniform items.

These differences in use often track job titles or categories, but these systematic, categorical variations are *in addition to* the individual determinations that the *In re Yazmin* Court found warranted striking the class allegations.  Delta employees presumably have the same variation in personal habits, medical history, pre-existing conditions, other medications, potential alternative causes, and skin and clothing care routines, as any other group, which multiply the individual issues for determining causation.  The history of items worn, how they were worn, for how long, and upon what instructions and advice, would be different between groups and for each individual, further individualizing the causation inquiry.[11]  In short, determining causation would require connecting diverse products to diverse employees with diverse interactions with the products.

> c.  *The Alleged Injuries Are Common, Subjective, and Determinable –*
> *If At All – Only Through Highly Individualized Inquiry*

Compounding these many and varied *inputs* to the equation, Plaintiffs allege a wide range of *outputs* in the form of physical ailments, many of which are extremely common and/or subjective in nature.  Compl. ¶¶ 2, 20, 21, 23, 34, 41 (including skin rashes, headaches, fatigue, breathing difficulties, hair loss, low white blood cell count, nausea, heart palpitations, body aches, sore throats, scarring, and "getting sick").

Fatigue, headaches, and "getting sick" are extremely common, endemic to jobs with high stress and long hours, impossible to quantify, and susceptible of many causes.  Even less common symptoms will have thousands of instances in a group of tens of thousands of people over a course of time.  Plaintiffs ask the Court to evaluate every rash, cold, flu, upset stomach, instance of fatigue, or headache since May 2018 for the 64,000 putative class members – all of whom are exposed daily to at least one airport's worth of communicable illnesses and chemicals.  Plaintiffs concede

---

[11] This variation particularly impacts the failure to warn claims, which are inherently case-specific.  *See, e.g.*, *Block v. Abbott Labs.*, 2002 WL 485364, at * 4 (N.D. Ill., Mar. 29, 2002) ("[W]e are very troubled by the prospect of having to resolve the highly individualized issue of proximate cause with respect to the failure-to-warn claim.").

that such determinations would be highly individual and require personal medical evaluation. *See* Compl. ¶¶ 37, 44 (named Plaintiffs allegations relying on patch tests); *see also In re PPA Prods. Liab. Litig.*, 208 F.R.D. 625, 631–32 (W.D. Wash. 2002) (cataloguing individualized issues relevant to causation which are indispensable to products liability class actions); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 66–67 (S.D.N.Y. 2002) (same).  Drawing a causal line from the many different products, through 64,000 diverse class members and their uses of the products, to a broad set of vague and subjective injuries would require further individualized inquiry by the fact-finder, including into the medical history and records of each putative class member, potential alternative causes, and more.

Determination of damages would also be highly individualized.  Injuries of the same type will necessarily be in a range of severity – and "severity" may not track ultimate compensable harm.[12]  Each employee will also have highly particular facts regarding mitigation, including the advice sought and received from Delta, Lands' End, physicians, and third parties, relief provided by Delta and/or Lands' End, and any self-help remediation (all as described more fully above). Whether and to what extent employees properly mitigated their damages, if any, will be an individual story for each Delta employee, to be explored through testimony and medical records.

In short, the causation and liability issues in this case are highly individual and not susceptible of "common answers apt to drive the resolution of the litigation."  *Shepherd v. ASI, Ltd.*, 295 F.R.D. 289, 297 (S.D. Ind. 2013).  "Given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the

---

[12] Nor is this a case where individual damages are able to be determined by a formula.  *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1042-43 (2016) (approving overtime damages calculation based on average time spent "donning and doffing" protective equipment).  *Tyson Foods* was based on employees engaging in the same activity and a statutory calculation of damages.  *See id.*  That is far from this case, where injuries vary in type, amenability to measurement, permanence, and so on.

significance of those uncommon questions, any overarching dispute about the health consequences of [the Delta uniform] cannot satisfy the Rule 23(b)(3) predominance standard." *Amchem Prods., Inc.*, 521 U.S. at 624.

        d.    *The Property Damage Claims Are Subject To The Same Predominance Issues and Have No Class Representative*

Individual issues similarly predominate over common ones with respect to Plaintiffs' compensatory property damage claims. The individualized issues are as numerous as under the personal injury claims and include the individualized uses, washing, and handling of the Delta uniform by the putative class members, which particular items the putative class member owns, the causation and permanence of any particular staining, the value of any property allegedly harmed through staining, the extent of any alleged staining, and more. Crucially, there is also no class representative for the property damage claims: neither Plaintiff has alleged property damage (indeed, Plaintiff Marte has never owned items alleged to cause damage). *See, e.g.*, *Conrad v. Boiron, Inc.*, 869 F.3d 536 (7th Cir. 2017) ("[T]he named plaintiff must 'be part of the class and possess the same interest and suffer the same injury as the class members.'"). [13]

        e.    *Supreme Court, Federal Appellate, and Seventh Circuit Practice and Precedent Come To The Same Conclusion*

As one district court in the Seventh Circuit recently observed, "no federal appellate court has approved a nationwide personal injury, product liability or medical monitoring class." *Durocher v. NCAA*, 2015 U.S. Dist. LEXIS *33-34 (collecting cases, granting a motion to strike class allegations); *In re Rezulin*, 210 F.R.D. at 65-66 (collecting cases, noting that "all relevant

---

[13] These commonality concerns also raise adequacy concerns where the named Plaintiffs allege "diverse medical conditions." *Amchem Prods., Inc.*, 521 U.S. at 626, 628 (holding that the putative class "cannot satisfy the requirements of common issue predominance and adequacy of representation"). It is extraordinary that Plaintiffs purport adequately to represent a products liability, personal injury class notwithstanding: (1) that they have owned and used few or none of the same products as many class members, (2) that they have not suffered many of the injuries they allege others have suffered, and (3) that their injuries are alleged to be the result of idiosyncratic allergies.

Court of Appeals and the bulk of relevant district court decisions have rejected class certification in products liability cases").  As the Supreme Court has held, personal injury claims are "likely to present 'significant questions, not only of damages but of liability and defenses of liability . . . affecting the [individual class members] in different ways.'"  *Amchem Prods., Inc.*, 521 U.S. at 625; *see also, e.g.*, *Jones v. Allercare*, 203 F.R.D. 290, 301 (N.D. Ohio 2001) (noting that the relevant question is not "whether the products have the capacity to cause harm, but whether [they] caused harm and to whom.  Thus, the real causation issue . . . is individual, not general, in nature."); *Kemp v. Metabolife Int'l, Inc.*, 2002 U.S. Dist. LEXIS 2435, *11 (E.D. La. Jan. 25, 2002) ("Product liability class actions generally do not meet the predominance requirement.").[14]

Simply put, "differences in the law of product liability," not to mention "in the applicable theories of recovery and their subsidiary concepts," preclude commonality in personal injury class actions.  *In re Yaz & Yasmin*, 275 F.R.D. at 275.  These differences are nuanced and "are not insignificant."  *Id*.  Rather, "such differences have led [the Seventh Circuit] to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes."  *In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1015; *see also, e.g.*, *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1300-02 (7th Cir. 1995) (decertifying a class noting the commonality, federalism, and Seventh Amendment concerns inherent in applying "nonidentical negligence laws" to a nationwide personal injury class); *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 674 (7th Cir. 2001)

---

[14] The only circumstances in which a products liability case is certified as a class is the relatively rare circumstance where there is a truly common harm, for example, an allegation that the entire class paid "a premium price" for a product, constituting "an injury in and of itself."  *See, e.g.*, *Belfiore v. Procter & Gamble Co.*, 94 F.Supp.3d 440, 447 (S.D.N.Y. 2015) (denying motion to strike because the entire class had paid a premium price for a product); *but see In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017, n.1 (7th Cir. 2002) (J. Easterbrook discussing the inefficiencies of allowing recovery by uninjured class members and of theories based on a product being "worth less than represented").  Plaintiffs here cannot allege any such premium price: many or most Delta employees did not actually pay for any Lands' End items themselves, instead using "points" provided by Delta.  Compl. ¶ 18.

19

(noting that lack of commonality is why "few warranty cases ever have been certified as class actions—let alone as nationwide classes"); *Isaacs v. Sprint Corp.*, 261 F.3d 679 (7th Cir. 2001).

The especially complex and individualized issues in the present case do not warrant variation from Supreme Court, federal appellate, and Seventh Circuit precedent.

<u>**CONCLUSION**</u>

It is apparent from the face of the Complaint that Plaintiffs' claims, for which many putative class members have no standing and which seek damages for highly individualized personal and property injuries, are inherently inappropriate for class treatment.   These legal deficiencies are a "key reality" that "no proffered or potential factual development offers any hope of altering." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011). Because Plaintiffs cannot obtain class certification with additional discovery, Lands' End respectfully requests that the Court strike Plaintiffs' class allegations.

Dated: December 3, 2019

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ U. Gwyn Williams
U. Gwyn Williams (*pro hac vice*)
Samuel Townsend (*pro hac vice*)
Jeremiah Cowen (*pro hac vice*)
200 Clarendon Street
Boston, Massachusetts 02116
Telephone: 617.948.6000
Facsimile: 617.948.6001
gwyn.williams@lw.com
samuel.townsend@lw.com
jeremiah.cowen@lw.com

*Attorneys for Defendant Lands' End, Inc.*