## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| GWYNETH GILBERT, MONICA DECRESCENTIS and STEPHANIE ANDREWS, et al., on behalf of themselves and all others similarly situated,<br><br>           Plaintiffs,<br><br>v.<br><br>LANDS' END, INC. and LANDS' END OUTFITTERS, INC.,<br><br>            Defendants. | Consolidated Civil Action No. 3:19-cv-823-JDP |

## BRIEF IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT ON CERTAIN EXPRESS
## WARANTY CLAIMS IN COUNT 5 OF THE CONSOLIDATED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION.............................................................................................................1

UNDISPUTED FACTS ....................................................................................................2

    A The Parties.............................................................................................................2

    B. Lands' End Agrees to Provide New Uniforms to Delta ............................................2

    C. Delta Employees Express Dissatisfaction with the Uniforms and Crocking ..........................4

    D. Express Warranties Applicable to the Plaintiffs .................................................6

    E. Lands' Ends' Conduct Related to the Crocking Warranty Claims...............................9

    F. Counsel Demands a Refund on Behalf of Plaintiffs and Lands' End Refuses........................9

LEGAL STANDARD ...................................................................................................11

ARGUMENT ...............................................................................................................11

    I.      PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT WITH RESPECT
             TO LANDS' END'S BREACH OF EXPRESS WARRANTY ................................11

          A.  Summary Judgment is Appropriate as to Lands' End Breach of the 100%
              Satisfaction Guaranty.......................................................................................12

          B.  This Court Should Grant Summary Judgment with Respect to Lands'
              End Breach of the Express Warranty that Its Products Will Be Free From
              Defects In Material And Workmanship...............................................................19

CONCLUSION..............................................................................................................22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bell Sports, Inc. v. Yarusso,*
 759 A.2d 582 (Del. Supreme Court 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Falcon Tankers, Inc. v. Littleton Systems, Inc.,*
 355 A.2d 898 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Freudenberg Spunweb Co. v. Fibervisions L.P.,*
 2006 WL 1064173 (Del. Super. Ct. Feb. 27, 2006) . . . . . . . . . . . . . . . . . . . . . . 11

*Gordon v. FedEx Freight, Inc.,*
 674 F.3d 769 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Green v. Canidae Corp.,*
 2010 WL 11507372 (C.D. Cal. Jan. 29, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 19

*K & K Pharmacy, Inc. v. Barta,*
 222 Neb. 215, 382 N.W.2d 363 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Luther v. Standard Conveyor Co.,*
 252 Minn. 135, 89 N.W.2d 179 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Midulla v. Howard A. Cain Co., Inc.,*
 133 N.C. App. 306, 515 S.E.2d 244 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*PCA Capital Partners v. G&M Int'l, LLC,*
 2018 WL 4590319 (N.D. Ill. Sept. 25, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*S. States Coop. v. Townsend Grain & Feed Co. (In re L. B.*,
    163 B.R. 709 (Bankr. D. Del. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Scarborough v. State*,
    945 A.2d 1103 (Del. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ungaretti & Harris, LLP v. Servicemaster Co.*,
    2010 WL 2167532 (N.D. Ill. May 27, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statutes**

6 Del. C. §2-313(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

6 Del. C. § 2-715(2)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

6 Del.C. § 2–715 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

6 Del.C. § 2-313(1)  and (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Rules**

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Federal Rule of Civil Procedure 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Regulations**

16 C.F.R. § 239.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Other Authorities**

13 *Williston on Contracts* § 38:21 (4th ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 2–313(1) and (2) of the Uniform Commercial Code . . . . . . . . . . . . . . . . . . . . . . . 12

# INTRODUCTION

Plaintiffs move for partial summary judgment against Defendants, Lands' End, Inc. and Lands' End Outfitters, Inc. (herein "Lands' End")with respect to Lands' End's breach of two specific express warranties contained in the Uniform Apparel Agreement ("UAA") expressly made applicable to the Delta employees as Third Party Beneficiaries of that Agreement.

Lands' End manufactured the Uniforms for Delta Airlines worn by 64,000 Delta employees commencing May 29, 2018. In this litigation, there are over a thousand plaintiffs, all Delta employees. Many have experienced the bleeding and transfer of colors from certain of the uniforms pieces, notably certain passport plum and cardinal red garments. This color transfer results in permanent damage to the clothing and property impacted by this crocking. Other plaintiffs are dissatisfied with the Uniforms for a variety of other reasons.

Paragraph 8(B) of the UAA includes an express warranty, which provides a 100% satisfaction guarantee; by its very terms, this provision permits the return of the uniform for any reason whatsoever, or for no specific reason. Lands' End has admitted that it has honored this contractual provision when a Delta employee has invoked the provisions. (Sersch dep. 83:17-21, Perrotti dep. 62:20-64:25) All named plaintiffs, including the class representatives, were dissatisfied with the Lands' End Uniforms and now seek to enforce that provision on behalf of themselves and all others similarly situated.

By letter dated September 25, 2020, plaintiffs' counsel made a written demand on Lands' End counsel for a refund of the purchase price or the value of the Points used to make the purchase. Lands' End has not complied with this demand, which was presented by Counsel on behalf of all plaintiffs.

Separate and distinct from the money-back guarantee provision, the UAA also provides the Uniforms will be free from defects in materials and workmanship and specifically warrants that the Uniforms will be colorfast. UAA at Paragraph 8(A) and Paragraph 9(A)(3) and (4) and Exhibit G. Lands End has admitted that crocking has been a major problem with the uniforms, and now seeks to blame the crocking problem on improper washing of the Uniforms. (Sersch dep.72:4-73:4 ; Perotti dep. 92:5-13, 94:1-25) Regardless of the attempted explanation of the cause of the crocking, the fact remains that the uniforms are subject to color bleeding and crocking. Per the UAA, this crocking condition amount to a breach of the express warranty in Paragraph 9(A)(3) and (4).

Plaintiffs are moving for partial summary judgment because the record establishes that there is no genuine dispute as to any material fact, that Plaintiffs are entitled to judgment as a matter of law with respect to either or both of breach of Lands' End's (1) express 100% satisfaction guarantee, or (2) warranty that the Uniforms would not be defective in materials and workmanship, and would be colorfast.

## UNDISPUTED FACTS

The following facts are undisputed for purposes of this motion. The citations are to Plaintiffs' Statement of Proposed Findings of Fact ("PFF"), which includes the citations to the record for each undisputed fact. The undisputed facts are established primarily through documents produced during discovery by Defendants and presented through the Nagel Declaration, sworn deposition testimony and the allegations and admissions set forth in Lands' End's Answer to Plaintiffs' Consolidated Complaint. (ECF No. 49).

A.   **The Parties**

2

1.      The Plaintiffs, including Class Representatives and parties identified in the Appendices to the Consolidated Amended Complaint are all Delta employees who were required to wear the Uniforms which are the subject of this litigation. As the issue which is the subject of this motion relate to all Plaintiffs there is no need to identify each person individually. (PFF1)

2.      The Defendant, Lands' End, Inc. is a Delaware Corporation with its headquarters at 1 Lands' End Lane, Dodgeville, Wisconsin. Lands' End Business Outfitters is a Division within Lands' End. (PFF2)

## B.      Lands' End Agrees to Provide New Uniforms to Delta

3.      In 2016, Delta contracted with Lands' End to provide new employee uniforms designed by Zac Posen ("Uniforms"), which all Delta Employees were required to wear during working hours. (PFF3)

4.      The Uniforms were comprised of several garments, including dresses, skirts, shirts, blouses, sweaters, jackets and pants that were described as high stretch, wrinkle and stain-resistant, waterproof, anti-static and deodorizing. (PFF4)

5.      Various chemical additives and finishes were used during the manufacturing process to ensure these characteristics.  (PFF5)

6.      Most of the garments were treated with a stain repellant containing Formaldehyde (PFF6)

7.      The Dyes used were supplied by overseas vendors and all listed mills producing the fabric and applying the Dyes were in Europe or the Far East. (PFF7).

8.      Some of the Uniform pieces have higher chemical contents than others, which is consistent with thousands of employees reporting problems, but not all.  (PFF8).

9.     On May 29, 2018, the Uniforms were officially launched and have been worn by approximately 64,000 Delta Employees. (PFF9)

10.     The amount of yearly revenue generated to Lands' End by the UAA starting with the rollout in May 2018 was in the tens of millions of dollars per year for each year. (PFF10)

**C.          Delta Employees Express Dissatisfaction with the Uniforms and Crocking**

11.     Within days after the Uniforms were introduced Delta Employees began to complain that they were experiencing health problems by wearing or merely being in proximity to the Uniforms. (PFF11)

12.     Kallie Sersch, the Lands' End National Account Specialist who was assigned to the Delta Uniform rollout situation, testified, that as early as June 2018, the first complaints were being raised by Delta Employees. (PFF12)

13.     Other Delta Employees experienced crocking onto other garments, towels and personal property. Crocking refers to the color transfer from a garment onto something else. (PFF13).

14.     There were 2,018 flight attendants who complained up through July 2019 (the date when Delta took over responsibility for responding to its employees' complaints), 289 customer service, ticket ramp and gate agents, and ACS complaints during this same period, 16 cargo employees, one GSE maintenance employee, 17 technical operations, 58 red coats, 66 ramp agent, and 5 VIP elite agents, for a total of 2,470 complaints. (PFF14)

15.     Lands' End broke these complaint categories down generally into skin irritation: 1,192, allergy: 419 and crocking: 358 for this same period.  (PFF15)

16.     In response to the question of whether the complaints were growing when she started her job and "rising at a rate that was causing concern," Sersch responded "Yeah, I think so." (PFF16).

17.     Sersch also conceded that she heard of instances where the dye was transferring to the wearer's skin and coming off on washcloths when they showered multiple times. (PFF17)

18.     Sersch testified of crocking on sheets, car seats, watches, even washing machines, and one from a Delta manager involving the jump seat on the plane. (PFF18)

19.     Sersch was also aware of employees complaining of hair loss and headaches (PFF19).

20.     Sersch conceded that Lands' End discovered that part of the Uniforms, the aprons, had contaminants and pulled them from the collection in the beginning of 2020). (PFF20)

21.     Michael Perrotti was the vice-president of sourcing and product development at the time of the Lands' End-Delta UAA and he was responsible for testing products before they were sold.  (PFF21).

22.     Perrotti acknowledged that all the garments were manufactured overseas. (PFF22)

23.     Perrotti acknowledged that Lands' End tells the fabric mills the final color standard they want but leaves it up to the mills to decide how to meet the color standards. Lands' End does not ask the mills what chemicals will be used in the manufacture of the garments. (PFF23).

24.     Perrotti conceded that a number of returns were triggered by skin rashes or irritation and a number of returns were a result of crocking issues. (PFF24)

25.    Perrotti admitted crocking involving passport plum uniform pieces occurred and claimed that Bureau Veritas tests showed the dyes running was allegedly due to outside additives, such as deodorant, perfume and excess laundry detergent. (PFF25).

26.    Perrotti conceded that there were crocking issues with the red coat in cruising cardinal that was made for Delta's ACS gate agents. (PFF26).

27.    Perrotti testified that he was aware that in November 2019 Delta changed its policy to permit employees not to wear the Lands' End Garments. (PFF27).

28.    Shelby Johnson is general manager over administrative services for Delta and is responsible for administering leaves and benefits.  (PFF28).

29.    Ms. Johnson testified that at a certain point roughly 50% of the flight attendants had transitioned to black and white. (PFF29)

**D.    Express Warranties Applicable to the Plaintiffs**

30.    The Uniform Apparel Agreement (UAA), contained several warranties which by their terms, applied to both Delta and Delta Employees who wore the Uniforms because the Delta Employees are recognized as intended beneficiaries under the UAA. "Lands' End admits that its uniforms would meet all applicable regulatory requirements, be suitable for their intended use, and fee of defects in material and workmanship. Lands' End stated to Delta and Delta's employees that it stands behind its products and is committed to providing quality products".( PFF30)

31.    The UAA Provides in relevant part,

6

8. WARRANTY, RETURNS AND EXCHANGES

A. Scope. Subject to the limitations and conditions below, Seller warrants that each Product purchased under this Agreement (other than Third Party Product Sourced by Delta) shall: . . .

(2) Meet all applicable regulatory requirements;

(3) Be suitable for its intended use before the public; and

(4) Be free of defects in material and workmanship.

B. Remedy. Except for Third Party Products Sourced By Delta, Seller agrees if at any time, for any reason, Delta, in the ordinary course of business, or any actively employed Employee is not 100% satisfied with their Products (even if they have been washed, worn and/or embroidered), they can return them at any time during the Term or for eighteen (18) months after the Term (so long as Delta continues to include the affected Products in its Above Wing Program and/or Below Wing Program) for a refund or exchange as set forth below. Seller will not charge a restocking fee. All returns and exchanges will be accompanied by a return/exchange form, as mutually agreed by the parties. For Delta Corporate Orders, Delta may elect whether to receive an exchange or refund. For Delta purchases with an Allotment, the Employee may elect whether to receive an exchange or Allotment credit, if the Employee chooses an Allotment credit, Seller shall refund Delta for the amount paid by Delta for that Allotment amount. For Employee purchases where his or her personal credit card was used, the Employee may elect whether to receive [sic] and exchange or refund. Seller shall process returns for exchange or credit within four (4) business days of receipt. ( PFF31)

32.    The UAA, at Paragraph 9(A)(3) and (4)  and  Exhibit G, provides:

(3) Test Certifications and Products. Seller shall provide test certificates of all fabrics used in production of the Products throughout the Term as requested by Delta or its designated testing agent. These test include but not limited to: lab-dip approvals, wet/dry crocking, colorfastness to cleaning, abrasion, laundry performance, pilling and resilience of fabric. Seller must provide completed Products, free of charge, for testing by Delta or its designated testing agent as requested at any point during the life of the agreement. All products must meet a minimum of "good" rating on any independent lab test reports. Seller agrees to provide all testing results to Delta prior to production, as reasonably requested, but no more than once per calendar year.

7

(4) Seller Quality Inspections. All Products sold to Delta or the Employees must meet the same standards of quality and technical specifications as the approved Sealed Samples (as defined below). Seller must provide written quality certification prior to implementation or anything as requested throughout the agreement. Tolerance levels to all specifications for this program, referenced in Exhibit G [General Specifications], will be mutually agreed prior to commencement of production. It is expected that Seller will conduct quality inspections at a minimum once during production, at the end of each production line, and before shipment. ( PFF32)

33.     Exhibit G-General Specifications provides, in relevant part:

. . .

All Products shall be colorfast and uniformly dyed and preshrunk within industry uniform tolerances (meet or exceed American Society for Testing and Materials (ASTM) and American Association of Textile Chemist and Colorists (AATCC) standards). ( PFF33)

34.     The Delta Employees who wore the Uniforms and were not 100% satisfied are entitled to a full refund pursuant to UAA Section 8(B). ( PFF34)

35.     Both the written terms of the warranty, and Lands' End employees who have been deposed, concede that under the contract, and on the Lands' End website, the  company affords a 100% guaranty on its product. ( PFF35)

36.     The 100% satisfaction warranty extends to Delta Employees as the end user of the products. (( PFF36)

37.     Lands' End also warrants its products will be free from defects in material and workmanship," (UAA Section 8(A)(4). ( PFF37)

38.     The UAA, at Paragraph 9(A)(3) and (4)  and  Exhibit G, included the actions that Lands' End was obliged to follow to ensure color fastness and "required that all garments meet the standards of quality and technical specification as the approved Sealed Samples." (( PFF38)

**E.        Lands' Ends' Conduct Related to the Crocking Warranty Claims**

39.     During the time period between the Uniform rollout and before Delta decided to take over the complaint response in July 2019, Lands' End received 358 reports of crocking. ( PFF39)

40.     No one at Lands' End really had an answer as to why all this crocking was going on. ( PFF 40)

41.     There was some internal discussion about providing additional washing instructions, such as advising the flight attendants to set the dye by putting the IFS dress in the dryer.  However, Sersch conceded that flight attendants typically have to wash their dresses in the sink and hang them to dry because they are staying in hotels, so having access to washers and dryers is not compatible with their work-lifestyle. ( PFF41)

42.     Although the UAA did not specifically provide for reimbursement for damaged property caused by crocking, Lands' End made approximately $3,000 in payments to Delta Employees for reimbursement for crocking damage during this time frame. ( PFF42)

43.     Lands' End had an arbitrary policy of only reimbursing for one instance of property destruction due to crocking. For example, Monica DeCrescentis who received reimbursement for $156.60 did not attempt to get reimbursed for the second set of sheets that were ruined because she knew it would be denied. (( PFF43)

**F.   Counsel Demands a Refund on Behalf of Plaintiffs and Lands' End Refuses**

44.     Plaintiffs' counsel has made a written demand for a refund of the purchase price or the value of the Points used to make the purchase seeking enforcement of the Satisfaction Guarantee, in a letter stating:

Counsel for Plaintiffs in the Consolidated Action hereby make a demand upon Lands' End for a full refund on behalf of all Plaintiffs pursuant to Paragraph 8B of the Uniform Apparel Agreement. (PFF44)

45.  Lands' End refused to comply with the demand. ( PFF45)

46.  Lands' End concedes that it reimbursed 358 Delta Employees for crocking damage in the approximate amount of $3,000This constitutes a tacit acknowledgement that Lands' End is at fault and is liable to Delta Employees who have experienced crocking.( PFF46)

47.  In representing its 100% Satisfaction Guarantee to Delta employees, Lands' End modified and simplified its contractual language, as follows:

> **"Lands' End Support**
>
> **Remember: Lands' End "Guaranteed. Period. We stand behind our goods and services and trust you will be happy with your purchase. In the event you're not, we have two words to help you rest easy. Guaranteed. Period.®**
>
> **Lands' End provides a team of dedicated customer service reps based in Wisconsin to manage all Delta employee inquires. Before returning garments, please call Lands' End customer service. Employees can return non-performing/fading garments at any time. Lands' End stands behind the quality of all of their products. Employees can call 1-800-960-9439 and Lands' End will expedite a replacement garment with a return shipping bag to make sending your garment in for replacement or exchange simple."** (( PFF47)

48.  The Plaintiffs would not have access to the UAA, which Plaintiffs' counsel received in the course of discovery in this case from Lands' End as a Confidential Document. (PFF48)

49.  The UAA at Paragraph 20 D provides that: "Governing Law. This Agreement shall be governed by and construed in, accordance with the laws of the. State of Delaware, without regard to its conflict of laws .principles." ( PFF49)

**LEGAL STANDARD**

Federal Rule of Civil Procedure 56 requires summary judgment be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To survive summary judgment, the nonmoving party must establish some genuine issue for trial such that a reasonable jury could return a verdict in [its] favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772-73 (7th Cir. 2012). In circumstances where there is a "complete failure of proof concerning an essential element of the nonmoving party's case ... [t]he moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). At summary judgment, it is a defendant's burden to create a triable issue of fact as to any affirmative defense it asserts. *See PCA Capital Partners v. G&M Int'l, LLC*, 2018 WL 4590319, at *3 (N.D. Ill. Sept. 25, 2018) (internal citations omitted), *aff'dsub nom.*, 790 F. App'x 822 (7th Cir. 2020). A mere scintilla of evidence in support of the non-movant's position is insufficient. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**ARGUMENT**

**POINT I**

**PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO LANDS' END'S BREACH OF EXPRESS WARRANTY**

All that is necessary to succeed on its breach of express warranty claim, under Delaware Law is proof that: (1) a warranty existed; (2) breach of the warranty; and (3) resulting damages.

An express warranty is created by: (1) an affirmation of fact or promise made by the seller (2) to the buyer (3) which relates to the goods and (4) becomes part of the basis of the bargain. 6 Del.C. § 2-313(1). See *Freudenberg Spunweb Co. v. Fibervisions L.P.*, 2006 WL 1064173, at *18

(Del. Super. Ct. Feb. 27, 2006), aff'd, 909 A.2d 594 (Del. 2006). *See also Bell Sports, Inc. v.*

*Yarusso*, 759 A.2d 582 (Del. Supreme Court 2000).

As discussed in *Bell Sports, supra*:

> The statutory basis for a claim for damages based on breach of an express warranty arising out of a sale of goods under Delaware law is found in this State's counterpart of the Uniform Commercial Code. Title 6, section 2–313(1) provides that express warranties of a seller of goods are created as follows:
>
> (a)     Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b)     Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c)     Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

As stated in *Bell, supra*. Title 6, section 2–313(1) and (2) are identical to § 2–313(1) and (2) of the

Uniform Commercial Code. The official commentary to that section under the U.C.C. indicates

that the drafters intended its warranty provisions to be construed and applied liberally in favor of

a buyer of goods.

As discussed below, plaintiffs have established each element of the breach for the 100%

satisfaction guarantee, and the express warranty of merchantability which explicitly includes a

warranty against crocking.

**A.     Summary Judgment is Appropriate as to Lands' End Breach of the 100% Satisfaction Guaranty**

Section 8(B) of the UAA, which governs warranty, returns and exchanges provides:

> Except for Third Party Products Sourced By Delta, Seller agrees if at any time, for any reason, Delta, in the ordinary course of business, or any actively employed Employee is not 100% satisfied with their Products (even if they have been washed, worn and/or embroidered), they can return them at any time during the Term or for eighteen (18) months after the Term (so long as Delta continues to include the affected Products in its Above Wing Program and/or Below Wing Program) for a refund or exchange as set forth below. Seller will not charge a restocking fee. All returns and exchanges will be accompanied by a return/exchange form, as mutually agreed by the parties. For Delta Corporate Orders, Delta may elect whether to receive an exchange or refund. For Delta purchases with an Allotment, the Employee may elect whether to receive an exchange or Allotment credit, if the Employee chooses an Allotment credit, Seller shall refund Delta for the amount paid by Delta for that Allotment amount. For Employee purchases where his or her personal credit card was used, the Employee may elect whether to receive [sic] and exchange or refund. Seller shall process returns for exchange or credit within four (4) business days of receipt.

Thus, this provision explicitly provides that any actively employed employee "who is not 100% satisfied with their Products" can return the garments "at any time during the Term or for eighteen (18) months after the Term"… for a refund or exchange…" For purchases made with an Allotment, "the Employee may elect whether to receive an exchange or Allotment credit. . ." Where a personal credit card is used, "the Employee may elect … an exchange or refund."

Both the written terms of the warranty, and Lands' End employees who have been deposed, concede that under the contract, the company affords a 100% satisfaction guarantee on its product.

In addition, the language included on the Lands' End website also constitutes an unconditional guarantee.

As Kallie Sersch testified during her deposition:

Q. Lands' End- -I've look at their website recently and in the past. Lands' End affords a 100 percent guaranty on its product, right?

A. Yes.

Q. So let's say I ordered a white shirt and I don't know it's white enough. I could just return it and no questions asked?

A. Correct. (Dkt. 58, Sersch dep. 83:17-25)

She further testified:

Q. Well, since you've joined Lands' End, you would agree with me, would you not, that Lands' End warrants its product will be free from defects in material and workmanship?

Ms. Williams: Objection.

A.Yes.

Q. And if there is such a defect, it's an automatic returnable item, no questions asked, correct?

A. Correct.

Q. And that's part of Lands' End standing practice on its 100 percent guaranty, right?

A. Yes.

Q. And, certainly, that would extend to these Delta employees as the end user of the product, right?

A. Yes. (Sersch dep. 87:7-23)

Similarly, Mike Perotti testified, as follows:

Q. Mr. Perotti, were you aware that the contract provided for a return policy for any reason whatsoever?

A. Yes.(Dkt. 59, Perotti dep.64:14-19)

14

Q. Okay. Do you know sitting here now approximately how many garments were returned under this provision?

A. I do not have a number. I know the return percentages, but I don't know kind of exact dollars and figures.

Q. Well could you give me the return percentages?

A. It was roughly 14 to 15 percent. (Perrotti dep. 65:11-19)

Q. Were you aware that a number of returns were triggered by skin rashes or irritation?

A. I know that we were receiving returns due to that.

Q. And were you aware that you were receiving returns as a result of crocking issues as well?

A. Correct. Yes. (Perotti dep. 67:11-18)

     All of the plaintiffs are seeking a refund pursuant to the 100% satisfaction guarantee contained in ¶8B of the UAA. Pursuant to this provision, all that is required is proof that the defective Uniform pieces were purchased or obtained with the Delta Points (Allotment) and the Plaintiffs should receive the appropriate reimbursement upon returning the garments.

     Plaintiffs' counsel has made a written demand for a refund of the purchase price or the value of the Points used to make the purchase seeking enforcement of the Satisfaction Guarantee, in a letter stating:

> Counsel for Plaintiffs in the Consolidated Action hereby make a demand upon Lands' End for a full refund on behalf of all Plaintiffs pursuant to Paragraph 8B of the Uniform Apparel Agreement. (See Nagel Dec. Ex. F,)

However, in responding to this letter and refusing to implement a refund remedy, counsel for Lands' End claimed that some Delta employees were not active, they had to first return the garments, and only those who used a credit card could receive cash back. (Nagel Dec. Ex. G)

We submit that Lands' End's refusal to comply with the demand made on behalf of the plaintiffs establishes the breach of warranty. Contrary to Lands' End's assertions  (1) each plaintiff was an "active employee" when they received the Uniform—otherwise they would not be getting the uniforms ,(2)All employees "had certain Delta Uniform garments," (3) anyone invoking the warranty was not 100% satisfied, (4) Although not every garment was returned to Lands' End, we submit that a return was only required in the case of an exchange , and (5) All the garments were still part of the Delta Uniforms Above Wing or Below Wing program when the demand was made.

Additionally, in representing its 100% Satisfaction Guarantee to Delta employees, Lands' End chose to modify and simplify its contractual language, See part of IFS Leader Talking Points at page 6:

> "Lands' End Support
> Remember: Lands' End "Guaranteed. Period. We stand behind our goods and services and trust you will be happy with your purchase. In the event you're not, we have two words to help you rest easy. Guaranteed. Period.®
> Lands' End provides a team of dedicated customer service reps based in Wisconsin to manage all Delta employee inquires.
> Before returning garments, please call Lands' End customer service. Employees can return non-performing/fading garments at any time. Lands' End stands behind the quality of all of their products. Employees can call 1-800-960-9439 and Lands' End will expedite a replacement garment with a return shipping bag to make sending your garment in for replacement or exchange simple."
> (Nagel Dec. Ex D at p.6)

Thus, the actual language which most of the employees saw, does not contain an actively at work requirement, or require that the garments must be part of a Delta program at the time of

the attempted exchange. Further, the return of a garment is only mentioned when an employee is seeking replacement or exchange.

We submit that this version of the 100% Satisfaction Guarantee is the one applicable in this case. The language quoted above, is the only version of the 100 % Satisfaction Guarantee which Delta Employees are advised of. The Delta employees do not have access to the actual UAA, which Plaintiffs' counsel received in the course of discovery in this case. (Nagel Dec. Par. 10) Hence, this is the version that should control.

Every class representative and plaintiff in this case *ipso facto* is not 100% satisfied with their Uniforms and are thus, entitled to a refund. The fact that Delta employee, Shelby Johnson, has testified that approximately 50% of their employees have switched to wearing black and white is evidence of the widespread dissatisfaction with the Lands' End Uniforms.

As admitted by Lands' End officials during depositions, Lands' End 100% satisfaction guarantee is unconditional. No reason for dissatisfaction needs to be provided in order to be entitled to a refund. Under the case law and treatises, the standard for determining satisfaction merely requires good faith on the part of the plaintiffs.   As set forth in 13 *Williston on Contracts* § 38:21 (4th ed.): "Promises to render a performance satisfactory to the other party, or to pay for a performance if it is satisfactory to the promisor, are common in contracts.. . . Since, . . .the promise is generally considered as requiring a performance which must be satisfactory in the exercise of honest judgment, contracts subject to a party's satisfaction have been almost universally upheld."(footnotes omitted). *See Scarborough v. State*, 945 A.2d 1103 (Del. 2008). See also *Ungaretti & Harris, LLP v. Servicemaster Co*., 2010 WL 2167532 (N.D. Ill. May 27, 2010)(court found written guarantee of client satisfaction in contract between law firm and client was more than a marketing tool and not too vague to be enforceable). *K & K Pharmacy, Inc. v. Barta*, 222

17

Neb. 215, 382 N.W.2d 363 (1986) (if an agreement leaves no doubt that honest satisfaction is intended, the condition precedent does not occur if the obligor is honestly, even though unreasonably, dissatisfied; while a mere statement of dissatisfaction is not conclusive, the evidence need only show honest dissatisfaction) ;*Midulla v. Howard A. Cain Co., Inc.*, 133 N.C. App. 306, 515 S.E.2d 244 (1999) (affirming summary judgment in favor of a purchaser whose purchase was conditioned on satisfaction with restrictive covenants and who was dissatisfied in good faith); *Luther v. Standard Conveyor Co.*, 252 Minn. 135, 142, 89 N.W.2d 179, 185 (1958)("When parties to a sales contract agree that the buyer's satisfaction is to be guaranteed, the standard to be applied is not that of a reasonable man in the buyer's position, which would be appropriate in an action involving negligence, but of the buyer himself acting in a reasonable manner. In this instance only defendant's reasonableness, good faith, and honesty in rejecting the machine, along with any changes which might have occurred between the time the machine was ordered and the time it was installed, were matters for consideration.")

Finally, 16 C.F.R. § 239.3, which is one of the Regulations promulgated by the Federal Trade Commission related to the interpretation of warranties under federal law, specifically addresses satisfaction guarantees, and provides:

> (a) A seller or manufacturer should use the terms "Satisfaction Guarantee," "Money Back Guarantee," "Free Trial Offer," or similar representations in advertising only if the seller or manufacturer, as the case may be, refunds the full purchase price of the advertised product at the purchaser's request.
>
> (b) An advertisement that mentions a "Satisfaction Guarantee" or a similar representation should disclose, with such clarity and prominence as will be noticed and understood by prospective

purchasers, any material limitations or conditions that apply to the "Satisfaction Guarantee" or similar representation.

In *Green v. Canidae Corp.*, 2010 WL 11507372, at \*4 (C.D. Cal. Jan. 29, 2010)the Court, citing

to this Regulation in a consumer class action involving dog food, stated:

> Canidae allegedly included the phrase "100% Satisfaction Guaranteed" on its packaging; however, Green specifically alleges that Canidae "did not offer to compensate her in any way...even in response to her formal demand letter." The other plaintiffs also generally allege that they "provided" Canidae "with notice" regarding the illness and diminishing health of their pets but their "demand was ignored." At the very least, the FAC's pleaded facts would support a claim for breach of the "satisfaction guaranteed" warranty statement."(internal references omitted))

In this case, since the plaintiffs are clearly dissatisfied with the Uniforms, and there is no

question but that they are exercising good faith in their dissatisfaction, the Court should enforce

the refund of Cash or Allotment (Points) remedy as to all the plaintiffs and Class Representatives.

**B.     This Court Should Grant Summary Judgment with Respect to Lands' End Breach of the Express Warranty that Its Products Will Be Free From Defects In Material And Workmanship**

Section 8 of the UAA, contains additional express warranties, including the following:

A. Scope. Subject to the limitations and conditions below, Seller warrants that each Product purchased under this Agreement (other than Third Party Product Sourced by Delta) shall: . . .

(2) Meet all applicable regulatory requirements;

(3) Be suitable for its intended use before the public; and

(4) Be free of defects in material and workmanship.

The UAA, at Paragraph 9(A)(3) and (4)  and  Exhibit G, provides:

> (3) Test Certifications and Products. Seller shall provide test certificates of all fabrics used in production of the Products throughout the Term as requested by Delta or its designated testing agent. These test include but not limited to: lab-dip approvals, wet/dry crocking, colorfastness to cleaning, abrasion, laundry performance, pilling and resilience of fabric. Seller must provide completed Products, free of charge, for testing by Delta or its designated testing agent as requested at any point during the life of the agreement. All products must meet a minimum of "good" rating

19

on any independent lab test reports. Seller agrees to provide all testing results to Delta prior to production, as reasonably requested, but no more than once per calendar year.

(4) Seller Quality Inspections. All Products sold to Delta or the Employees must meet the same standards of quality and technical specifications as the approved Sealed Samples (as defined below). Seller must provide written quality certification prior to implementation or anything as requested throughout the agreement. Tolerance levels to all specifications for this program, referenced in Exhibit G [General Specifications], will be mutually agreed prior to commencement of production. It is expected that Seller will conduct quality inspections at a minimum once during production, at the end of each production line, and before shipment.

Exhibit G-General Specifications provides, in relevant part:

. . .

All Products shall be colorfast and uniformly dyed and preshrunk within industry uniform tolerances (meet or exceed American Society for Testing and Materials (ASTM) and American Association of Textile Chemist and Colorists (AATCC) standards).

Thus, Lands' End warrants its products will be "free from defects in material and workmanship" and requires that fabrics must be tested for crocking and meet at least the "good standard" and that all products shall be, inter alia, "colorfast." Plaintiffs who wore the Uniforms that were not free from defects in materials or workmanship and that crocked and are not color fast are entitled to compensation for breach of the express warranty included in the contract itself at ¶¶ 8A (4) and 9(A)(  This remedy may include incidental and consequential damages, such as recovery for items damaged because of the breach, as a remedy. 6 Del.C. § 2–715.

"[T]he Delaware U.C.C. provides for incidental and consequential damages as a remedy for breach of warranty when the damages were reasonably foreseeable at the time of contracting." *S. States Coop. v. Townsend Grain & Feed Co. (In re L. B. Trucking),* 163 B.R. 709, 723 (Bankr. D. Del. 1994).   See 6 Del.C. § 2–715. *See Falcon Tankers, Inc. v. Littleton Systems, Inc.,* Del.Super., 355 A.2d 898, 907 (1976). Under Delaware's U.C.C. at "(2) Consequential damages

resulting from the seller's breach include. . . (b) injury to person or property proximately resulting from any breach of warranty." Consequential damages are granted where the breach is the proximate cause of the loss and the damages were reasonably foreseeable. See *Falcon Tankers, Inc. v. Litton Systems, Inc.*, Del.Super., 355 A.2d 898 (1976).

Numerous plaintiffs have experienced crocking and color staining which also constitutes a breach of the warranty that the Uniforms would be free of defects in materials or workmanship and would be colorfast. Thus, crocking constitutes a breach of warranty under the various provisions in the UAA and the U.C.C. applicable in Delaware, cited above.

Lands' End acknowledges that it reimbursed 358 Delta Employees for crocking damage in the approximate amount of $3,000. This constitutes a tacit acknowledgement that Lands' End is at fault and is liable to Delta Employees who have experienced crocking. Moreover, these injuries to the personal property of plaintiffs constitutes consequential damages which are recoverable under Delaware law.

Because many Delta employees did not seek reimbursement and others only sought reimbursement once while the crocking continued, there are many instances of crocking damage that have not been reimbursed. Lands' End should be required to reimburse Plaintiffs for the value of the personal property destroyed by the Uniforms crocking on plaintiffs' possession pursuant to 6 Del. C. § 2-715(2)(b) .

In addition to constituting a breach of the express warranty related to materials and workmanship, the UAA at Para. 9(A)(3) and (4) and Exhibit G provides that test certification for crocking and colorfastness was required, and mandated that all Products sold to Delta or to the Employees would meet the specification of the Sealed Samples, and were required to be, inter alia, "colorfast." The failure to comply with these contractual requirements constitutes an explicit

breach of warranty under 6 Del. C. §2-313(1)(C). Thus, plaintiffs are entitled to both a refund and reimbursement for the damage to personal property caused by the crocking by way of summary judgment.

## **CONCLUSION**

For all of the foregoing reasons, partial summary judgment with respect to the breach of the 100% Satisfaction Guaranty and breach of the express warranty that the Uniforms would be free from defects in materials and workmanship claims should be granted.

Respectfully submitted,

**NAGEL RICE, LLP**

*/s/ Bruce H. Nagel*
**Bruce H. Nagel**
(Admitted *Pro Hac Vice*)
Randee M. Matloff
(Admitted *Pro Hac Vice*)
103 Eisenhower Parkway
Roseland, New Jersey 07068
973.618.0400
bnagel@nagelrice.com
rmatloff@nagelrice.com

**TERRELL HOGAN YEGELWEL, PA**
*/s/ Bruce A. Maxwell*
**Bruce A. Maxwell**
Admitted to the U.S. Supreme Court:
03/29/1993
**Bradley Bodiford**
Appearing Pro Hac Vice
Terrell Hogan Yegelwel, P.A.
233 East Bay Street, 8th Floor
Jacksonville, Florida 32202
(904) 632-2424
Maxwell@terrellhogan.com
Bodiford@terrellhogan.com

**URBAN & TAYLOR, S.C.**

*/s/ Jay Urban*⎯⎯⎯⎯⎯⎯⎯⎯⎯
**Jay Urban**
Wisconsin Bar No.: 1018098
The Urban Taylor Law Building
4701 N. Port Washington Road
Milwaukee, Wisconsin 53212
(414) 906-1700
jurban@wisconsininjury.com
rscarletta@wisconsininjury.com