## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| GWYNETH GILBERT and MICHAEL MARTE, on behalf of themselves and the Putative Class, <br><br> Plaintiffs, <br><br> v. <br><br> LANDS' END, INC., <br><br> Defendant. | Civil Action No. 3:19-cv-00823-jdp |
| STEPHANIE ANDREWS, et al on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> LANDS' END, INC. and LANDS' END OUTFITTERS, INC. <br><br> Defendants. | Civil Action No. 3:19-cv-01066-jdp |

**DEFENDANT LANDS' END, INC.'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO EXCLUDE THE OPINIONS OF PAMELA SCHEINMAN, M.D.**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ...........................................................................................1

II.   BACKGROUND ...........................................................................................2

III.  LEGAL STANDARD......................................................................................4

IV.   ARGUMENT ................................................................................................5

    A.    For the 588 Plaintiffs for Whom She Reviewed No Medical Records,
        Dr. Scheinman's Opinions Should Be Excluded Because Her
        Methodology Is Not Reliable ...............................................................5

        1.    Dr. Scheinman Did Not Follow Her Own Professional Methods for
            Determining Specific Causation ...............................................6

        2.    Dr. Scheinman Did Not Reliably Apply the Mathias Criteria to
            Diagnose Contact Dermatitis ......................................................9

        3.    Dr. Scheinman's Opinions on Respiratory Symptoms and Alopecia
            Are Also Based on Flawed Methodologies and Unreliable......................10

    B.    Dr. Scheinman's Methodology for Assessing Cause Is Not Reliable Even
        for the 15 Plaintiffs Whose Partial Medical Records She Did Review ................12

V.    CONCLUSION...............................................................................................16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Barber v. United Airlines, Inc.*,
    17 F. App'x 433 (7th Cir. 2001) ......................................................................................8, 12

*Brown v. Burlington N. Santa Fe Ry. Co*.,
    765 F.3d 765 (7th Cir. 2014) .......................................................................................4, 5, 15

*Chapman v. Maytag Corp.*,
    297 F.3d 682 (7th Cir. 2002) .......................................................................................4, 7, 8

*Clark v. Takata Corp.*,
    192 F.3d 750 (7th Cir. 1999) ...........................................................................................5, 15

*Daubert v. Merrell Dow Pharms., Inc*.,
    509 U.S. 579 (1993) ..............................................................................................................4

*Eghnayem v. Boston Sci. Corp.*,
    57 F. Supp. 3d 658 (S.D. W. Va. 2014) ............................................................................13

*Gayton v. McCoy*,
    593 F.3d 610 (7th Cir. 2010) ............................................................................................11

*Gopalratnam v. Hewlett-Packard Co.*,
    877 F.3d 771 (7th Cir. 2017) ............................................................................................15

*Kirk v. Clark Equip. Co.*,
    991 F.3d 865 (7th Cir. 2021) ........................................................................................5, 14

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................................................4

*Lewis v. CITGO Petroleum Corp*.,
    561 F.3d 698 (7th Cir. 2009) ..............................................................................................4

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
    No. 02 C 4356, 2010 WL 2607241 (N.D. Ill. June 23, 2010) ...................................7

*Naeem v. McKesson Drug Co.*,
    444 F.3d 593 (7th Cir. 2006) ........................................................................................4, 8

*Rains v. PPG Indus., Inc.*,
    361 F. Supp. 2d 829 (S.D. Ill. 2004) ..................................................................................5

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996) ...................................................................8

*Schultz v. Akzo Nobel Paints, LLC*,
721 F.3d 426 (7th Cir. 2013) .............................................................5, 14

*Stutzman v. CRST, Inc.*,
997 F.2d 291 (7th Cir. 1993) ..................................................................4

*United States v. Truitt*,
938 F.3d 885 (7th Cir. 2019) ..................................................................4

## RULES

Fed. R. Evid. 702 ...............................................................................2, 4, 7

## OTHER AUTHORITIES

U.S. Bureau of Labor Statistics, *Occupational Safety and Health Definitions*,
https://www.bls.gov/iif/oshdef.htm (last visited Sept. 25, 2021) ............................9

## I.      INTRODUCTION

Dr. Pamela Scheinman is a dermatologist who purports to opine that Lands' End uniforms caused Plaintiffs' dermatological symptoms, respiratory symptoms, ocular symptoms, hair loss, and sensitization. Although she practices medicine, Dr. Scheinman never spoke with, examined, treated, or reviewed complete (and in most cases, any) medical records for any Plaintiff in this case. As a result, her methodology for determining causation is unreliable and her purported causation opinion should be excluded. Indeed, Dr. Scheinman was candid in her deposition about the difficulty of diagnosing and determining causation for patients, and the steps necessary to do so, which she admitted should include review of individual-specific information. Nonetheless, Dr. Scheinman's report concluded that the uniforms were the cause of all of the Plaintiffs' dermatological symptoms, respiratory symptoms, ocular symptoms, hair loss, and sensitization based on a chart Plaintiffs' counsel created and based on review of Plaintiffs' counsel-selected medical records from just 15 Plaintiffs.[1] In this case, Dr. Scheinman took none of the steps that she herself testified were necessary for determining causation. Instead, her report offered unsupported and speculative opinions, and ones that in many instances go beyond her qualifications as a dermatologist.

Indeed, Dr. Scheinman has already limited her opinion herself. Originally, Dr. Scheinman claimed in her report to be able to opine on causation for all of the then-1,001 Plaintiffs. But then she admitted during her deposition, that actually she can *only* opine on specific causation about the 15 Plaintiffs for whom she reviewed partial medical records—records that were chosen by Plaintiffs' counsel (even though additional medical records had been collected and were readily

---

[1] Dr. Scheinman reviewed partial medical records from 16 Plaintiffs, but one of those Plaintiffs has since been dismissed.

available).  Relying on only a select set of records provided by attorneys is not a reliable methodology for treating, diagnosing, or making determinations about causation (by Dr. Scheinman's own admission), and does not satisfy the *Daubert* requirements.  Because Dr. Scheinman still purports to opine on causation from that unreliable and incomplete data set, her opinions do not meet the standards of Federal Rule of Evidence 702 or *Daubert* and are unable to assist the trier of fact.  Her testimony should be excluded even as to the 15 Plaintiffs for whom she still purports to opine on causation.

## II.    BACKGROUND

Although the 603 Plaintiffs in this matter (all current and former employees of Delta Air Lines, Inc. ("Delta")) claim that various garments in their work uniform line, manufactured by Lands' End, caused a wide range of physical and emotional ailments, as a dermatologist, Dr. Scheinman is only potentially relevant as to those Plaintiffs who claim some dermatological malady such as rashes, itching, skin irritation, blisters, and hair loss.  The overwhelming majority of the 64,000 current and former Delta employees who wore the uniforms never complained of any health effects.

### Dr. Scheinman's Report and Testimony

Dr. Pamela Scheinman is a dermatologist.  Dr. Scheinman states in her report that for all Plaintiffs who suffered from the listed symptoms, "within a reasonable degree of medical probability the dermatological symptoms, respiratory symptoms, and sensitization, as well as ocular symptoms and alopecia, were proximately caused by Lands' End Uniforms."  Dkt. No. 175, Rule 26 Report of Pamela L. Scheinman, M.D. ("Scheinman Report") at 4.  Dr. Scheinman also states in her report that her "professional opinion" is based upon review of office notes of the treating physicians, including allergists and dermatologists who treated certain Plaintiffs.  *Id.* at 5. In her report, Dr. Scheinman cites to specific medical records that she claims show patch testing

results and other dermatological symptoms and respiratory symptoms, and relies on garment testing results commissioned by Plaintiffs' counsel. *Id.* at 5-10. But in her deposition testimony, Dr. Scheinman clarified that she also relied on a chart compiled by Plaintiffs' counsel (Dr. Scheinman was not aware what source yielded the data used to compile that chart) and viewed only partial medical records from just 15 Plaintiffs.[2] *See* Decl. of U. Gwyn Williams in Support of Lands' End, Inc.'s Mot. to Exclude the Opinions of Pamela Scheinman, M.D. ("Williams Decl."), Ex. A, "Quantitative Summary of Medical Injuries Related to Delta Uniforms (created by counsel)"; Dkt. No. 170, Dep. of Pamela Scheinman, M.D., dated February 9, 2021 ("Scheinman Dep.") at 79:3–85:6, 86:18–87:1. As described *infra* Section III, Dr. Scheinman's report draws broad conclusions from a narrow set of counsel-selected data on a small fraction of the total number of Plaintiffs, including limited patch testing results, one garment testing result, and supposition about mercury causing hair loss among some Plaintiffs, without regard to any particular level of mercury allegedly found in any particular uniform garment.

In deposition, Dr. Scheinman ultimately conceded that she can only offer causation opinions about the 15 Plaintiffs for whom she reviewed partial medical records. Scheinman Dep. at 279:15–25 ("Q. But you don't have any information one way or the other about whether the uniforms were a contributing cause of skin rashes for any employees other than one whose records you reviewed already?" "A. That's true. I mean I can only summarize, but yes. I can't – without seeing them, I can't – but it does seem suspicious. It seems like a smoking gun to me.").

---

[2] Dr. Scheinman reviewed partial medical records for Plaintiffs Joseph Abamonte, Rachel Abukhdeir, Stephanie Andrews, Debra Baretta, Cori Behrends, Veronica DeMaggio, Harriett Duranthon, Gwyneth Gilbert, Michael Marte, Michele Noren, Penny Owens, Diana True, Kathryn Ude, Lynda Valdez, and Michelle Warner. Dr. Scheinman also reviewed partial medical records for a Plaintiff who has since been dismissed. *See* Scheinman Report, Ex. C, "Documents Reviewed."

Continuing, Dr. Scheinman acknowledged that even for those patients, she did not take the steps she would take in her clinical practice to determine causation (e.g., interview the patient, conduct a physical exam, rule out alternative causes, or examine symptoms after the suspected irritant is removed). *Id.* at 92:3–21.

## III.   LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony in federal courts, even when jurisdiction rests on diversity. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); *Stutzman v. CRST, Inc.*, 997 F.2d 291, 295 (7th Cir. 1993). Whether expert testimony is admissible depends on: "[1] whether the expert is qualified, [2] whether his methodology is scientifically reliable, and [3] whether the proposed testimony 'will help the trier of fact to understand the evidence or to determine a fact in issue.'" *United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019) (quoting Fed. R. Evid. 702). The proponent of the expert testimony must establish these requirements by a preponderance of the evidence. *Lewis*, 561 F.3d at 705. *Daubert* requires the district court to perform the role of gatekeeper and to "ensure the reliability and relevancy of expert testimony." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

To be reliable, an expert's opinion must be subjected to the "scientific method" and cannot be the product of "subjective belief or unsupported speculation." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). "*Daubert* la[ys] out four factors by which courts can evaluate the reliability of expert testimony: (1) whether the expert's conclusions are falsifiable; (2) whether the expert's method has been subject to peer review; (3) whether there is a known error rate associated with the technique; and (4) whether the method is generally accepted in the relevant scientific community." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014). "[T]he

4

correct inquiry focuses not on 'the ultimate correctness of the expert's conclusions,' but rather on 'the soundness and care with which the expert arrived at her opinion.'" *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th Cir. 2021) (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). An expert must rely on facts or data, not "subjective impressions." *Brown*, 765 F.3d at 772. It is "axiomatic that proper expert testimony must be derived by the scientific method." *Rains v. PPG Indus., Inc.*, 361 F. Supp. 2d 829, 833 (S.D. Ill. 2004) (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 756 (7th Cir. 1999)).

## IV. ARGUMENT

Dr. Scheinman purports to offer an opinion that all Plaintiffs who experienced "dermatological symptoms, respiratory symptoms, and sensitization, as well as ocular symptoms and alopecia," after wearing the Lands' End uniforms experienced those symptoms because of the Lands' End uniforms. *See* Scheinman Report at 4. Dr. Scheinman reviewed no medical records for 588 current Plaintiffs, but instead relied on a chart compiled by Plaintiffs' counsel for any Plaintiff-specific information. By her own admission, Dr. Scheinman should have reviewed more information for each member of that group in order to employ a reliable method for determining causation. Even for the 15 Plaintiffs for whom Dr. Scheinman reviewed partial medical records prior to opining that the Lands' End uniform caused the relevant alleged symptoms or injuries, Dr. Scheinman's methodology was unreliable by her own metrics, and her opinions would not assist the fact finder. Thus, the Court should exclude Dr. Scheinman's opinions in their entirety.

### A. For the 588 Plaintiffs for Whom She Reviewed No Medical Records, Dr. Scheinman's Opinions Should Be Excluded Because Her Methodology Is Not Reliable

Dr. Scheinman admitted that it would not be a reliable method for determining the cause of a patient's symptoms if the physician did not gather sufficient information, because assessing specific causation requires a complex and fact-dependent analysis for each individual. Scheinman

Dep. at 40:25–43:23.  For that reason, Dr. Scheinman's opinions should be excluded in their entirety as to the 588 Plaintiffs for whom she reviewed no medical records.

      1.    <u>Dr. Scheinman Did Not Follow Her Own Professional Methods for Determining Specific Causation</u>

In deposition, Dr. Scheinman testified forthrightly to the flaws in her report's methodology. According to Dr. Scheinman, to determine the cause of a patient's malady a physician must:

- "ask the patient" about, *inter alia*, the length of symptoms, locations, and attempted treatments, and take a complete medical history.  Scheinman Dep. at 34:11–19, 41:20–43:23;

- conduct a physical exam.  Scheinman Dep. at 35:8–10;

- "check scales," view the dermatologic condition under a microscope, do a biopsy, order lab work, refer the patient to a specialist, rule out other causes, look for other associated symptoms, order patch testing, or ask the patient to change skin care products, wear different textiles, or change their diet.  Scheinman Dep. at 35:10–37:8; and

- for self-reported systems, "see validation – you know, somebody else looking at it."  Scheinman Dep. at 85:12–22.

In reaching her causation opinions for 588 Plaintiffs in this case, though, Dr. Scheinman did none of those things.  Instead, for those 588 Plaintiffs, Dr. Scheinman relied exclusively on a chart compiled by Plaintiffs' counsel, for which she was unaware of the source of the data. Scheinman Dep. at 79:3–85:6, 267:9–21.[3]  In fact, Plaintiffs' counsel apparently prepared the chart that Dr. Scheinman relied upon from Plaintiffs' self-prepared responses to a questionnaire drafted

---

[3] These facts raise significant red flags regarding the reliability of Dr. Scheinman's methodology. *See infra* Section III.B.

by counsel for Lands' End.  Thus, Dr. Scheinman did not even rely on Plaintiffs' self-reported answers, but on Plaintiffs' counsels' secondhand summary of that information.[4]  Dr. Scheinman did not speak with or treat any Plaintiff, and admitted that in the ordinary course of her practice she would not diagnose a patient—let alone determine causation—without speaking to them or reviewing their medical records.  *Id.* at 92:3–21, 100:11–17 ("Q. Would you ever diagnose a patient yourself without ever having spoken to the patient or seen medical records? A. Would I diagnose a patient without having seen them or seeing the medical records; in general, no.").  Standing alone, Dr. Scheinman's failure to follow her own professional methods is grounds for excluding her causation opinion.  *See Chapman*, 297 F.3d at 688 ("The *Daubert* standard and Rule 702 are designed to ensure that, when expert witnesses testify in court, they adhere to the same standards of intellectual rigor that are demanded in their professional work."); *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, No. 02 C 4356, 2010 WL 2607241, at *7 (N.D. Ill. June 23, 2010) (excluding expert who did not follow his own professional methodology to opine).

Dr. Scheinman eventually admitted that she lacked sufficient information to form any causation opinion about the 588 Plaintiffs for whom she did not review any medical records whatsoever.  Scheinman Dep. at 270:25–271:6 ("Q. For everybody else who is a Delta employee who reported some skin symptoms, you do not currently have enough information to, for each one of those people individually, answer these questions, yes or no? A. That's correct.  Absolutely.").  With respect to whether Dr. Scheinman had any information as to whether the uniform was a contributing cause to any Plaintiffs' skin rash for whom she had not reviewed medical records (all

---

[4] That chart, on which Dr. Scheinman relied for providing medical opinions, contains disclaimers stating, "This list was solely prepared to be used as a generally accurate estimate," and "We cannot accurately add up how many plaintiffs have reported skin issues at this time."  Williams Decl., Ex. A, "Quantitative Summary of Medical Injuries Related to Delta Uniforms (created by counsel)."

but 15 Plaintiffs), Dr. Scheinman stated "I mean I can only summarize," and "I can't – without seeing them, I can't – but it does seem suspicious.  It seems like a smoking gun to me."  *Id.* at 279:21–25.

Thus, as to the 588 Plaintiffs for whom Dr. Scheinman reviewed no medical records, her report and opinions comprise precisely the sort of unsupported speculation this Court, as gatekeeper, must exclude under *Daubert*.  *Chapman*, 297 F.3d at 686–87.  "It seems like a smoking gun to me" is not a scientific conclusion—and is not based on any acceptable scientific method subject to peer review or with a known error rate.  *See Naeem*, 444 F.3d at 608 ("Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology.") (citation omitted).  Despite Dr. Scheinman's qualifications, her testimony is unscientific speculation—nothing more.  *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996) ("Under the regime of [*Daubert*] a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.") (citation omitted).

Relatedly, in attempting to opine on cause for 588 Plaintiffs for whom she reviewed no medical records, Dr. Scheinman ignored the many thousands of Delta employees who experienced no symptoms, and indeed thought that the population of Delta employees wearing the uniform was 6,400, rather than 64,000.  Scheinman Dep. at 98:22–99:7.  Instead, she relied on a counsel-prepared summary chart to try to render a causal opinion for nearly 600 Plaintiffs, and disregarded all evidence that did not support her conclusion, such as the tens of thousands of Delta employees who wore the uniforms without issue, additional medical records from Plaintiffs, and the fact that many of these symptoms are common among the general population.  An opinion drawn from "cherry-picked" facts does not satisfy the scientific method and *Daubert*.  *See Barber v. United*

8

*Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) ("Because in formulating his opinion [expert] cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and *Daubert*, and it thus fails to 'assist the trier of fact.'"). Thus, Dr. Scheinman's opinion is not grounded in the scientific method, is speculative and unreliable, and will not assist the trier of fact. For these reasons, and by Dr. Scheinman's own admission, her opinions must be excluded from this case with respect to the 588 Plaintiffs for whom she reviewed no medical records.

> 2.    Dr. Scheinman Did Not Reliably Apply the Mathias Criteria to Diagnose Contact Dermatitis

As to the 588 Plaintiffs for whom she reviewed no medical records, Dr. Scheinman's attempts to apply an individualized diagnosis tool for occupational contact dermatitis do nothing to make her causation opinion reliable—even for those Plaintiffs who reported symptoms arguably consistent with occupational contact dermatitis. Put simply, Dr. Scheinman's methodology for attempting to diagnose occupational contact dermatitis is unreliable. Dr. Scheinman purports to rely on a methodology delineated in a 1989 article by a Dr. Toby Mathias. Scheinman Report at 6–7. Dr. Mathias outlined seven criteria for diagnosing occupational contact dermatitis and stated that if the patient has four or more of the seven criteria, a physician can diagnose occupational contact dermatitis.[5] *Id.* But Dr. Scheinman admitted that the Mathias article is clear that the criteria are to be applied by a treating physician who is physically examining the individual patient. *See* Scheinman Dep. at 241:18–22. There is no scientific literature supporting Dr. Scheinman's use of the Mathias criteria to diagnose contact dermatitis among individuals who she has never

---

[5] Occupational dermatitis is defined as any illness involving a worker's skin that is caused by work exposure to chemicals, plants, or other substances. Examples include contact dermatitis, eczema, or rash. U.S. Bureau of Labor Statistics, *Occupational Safety and Health Definitions*, https://www.bls.gov/iif/oshdef.htm (last visited Sept. 25, 2021).

treated and on a population-wide basis.  Still, rather than apply the criteria to individual Plaintiffs, Dr. Scheinman attempted to apply the criteria to all Plaintiffs generally, without evaluating them individually.  Scheinman Report at 6–7.  During her deposition, Dr. Scheinman acknowledged that she cannot apply the criteria for any of the Plaintiffs for whom she did not review even partial medical records.   Scheinman Dep. at 242:1–4, 270:25–271:6.   Dr. Scheinman's erroneous application of the Mathias criteria is therefore unreliable and should be excluded along with the rest of her unreliable and unsupported opinions.[6]

### 3.   Dr. Scheinman's Opinions on Respiratory Symptoms and Alopecia Are Also Based on Flawed Methodologies and Unreliable

Dr. Scheinman's opinions that the uniforms caused respiratory symptoms and hair loss among the 588 Plaintiffs for whom she did not review any medical records fail for the same reason as her opinions on occupational contact dermatitis—Dr. Scheinman reviewed no medical records and undertook no further inquiry.  Scheinman Dep. at 133:3–135:4.  Moreover, as to respiratory symptoms, Dr. Scheinman is a dermatologist—she has no relevant expertise in respiratory conditions and symptoms.   Scheinman Dep. at 111:3–17. She therefore lacks the relevant qualifications and expertise to opine on issues of respiratory symptoms.   Her opinions on

---

[6] Dr. Scheinman claims that surveillance studies from occupational contact dermatitis rates in the United Kingdom are comparable to "skin complaints" among Delta employees in the United States.  Scheinman Report at 7.  It is not clear why Dr. Scheinman compares the two, but she seemingly argues that the United Kingdom studies support the notion that Plaintiffs' skin complaints were a result of the uniform.  Simply stating that the Delta flight attendants have a higher rate of "skin complaints" than a survey of all workers in the United Kingdom is not a scientifically reliable method of evaluating causation.  In making that comparison, Dr. Scheinman accepted the number of self-reported symptoms among Delta employees as true, whereas the surveillance study in the United Kingdom used rates of *treating physician-diagnosed* occupational contact dermatitis.  Additionally, Dr. Scheinman places self-reported *symptoms* like "eczema, skin blisters, hives, bruising, hair loss, skin irritation, and itchiness" in the same category as treating-physician *diagnosed* cases of occupational contact dermatitis.  Scheinman Report at 7.  Rates of symptoms and rates of diagnoses are not a valid comparison.

respiratory symptoms should be excluded for that reason alone. *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("[S]imply because a doctor has a medical degree does not make [her] qualified to opine on all medical subjects.").

But even more problematically, Dr. Scheinman's opinion regarding the cause of alleged respiratory symptoms among Plaintiffs whose medical records she did not review is apparently based on nothing more than an unsupported leap from a few Plaintiffs with partial medical records indicating respiratory symptoms. From that "foundation," Dr. Scheinman apparently concludes that all Plaintiffs' respiratory symptoms are caused by "off gassing"[7] of "allergens and irritants" from the uniforms. Scheinman Dep. at 134:21–135:15 ("Q. When you say the respiratory data that you had are you referring to the medical records of I think it was two or three people who had respiratory issues? A. Correct, . . . Q. And you've assumed then that that would similarly be true for every Delta employee who reported any respiratory symptom? A. I'd say that I – I think likely the vast majority if they were – you know, if it was together with the – you know, if it was together with the – in temporal relationship to the new uniform I'd say it's reasonable to make that assumption."). As the only quasi-objective basis for her leap of faith on respiratory symptoms, Dr. Scheinman cites one set of garment testing results that purportedly showed formaldehyde exceeding OEKO-TEX limit values (OEKO-TEX is a private group of organizations that set limits for chemicals in garments). *See* OEKO-TEX, About Us, https://www.oeko-tex.com/en/about-us (last accessed September 30, 2021) ("We consist of 18 independent research and test institutes in Europe and Japan. They are responsible for the joint development of test methods and limit values which form the basis for our standards."). In doing so, she ignores that OEKO-TEX limits are

---

[7] According to Dr. Scheinman, off-gassing is a process by which "there are release of I would say probably dye and/or formaldehyde resins and probably other substances from garments . . ." Scheinman Dep. at 157:16–21.

regulatory values, not health standards, and that the limits set by OEKO-TEX are for direct skin contact, *not off-gassing*.  Dkt. No. 178, Expert Report of Marion J. Fedoruk, MD, CIH, DABT, FACMT, FACOEM ("Fedoruk Report") at 46.  And other than stating that formaldehyde is a known allergen and irritant, Dr. Scheinman does not explain what symptoms are associated with off-gassing of formaldehyde, let alone that those symptoms are consistent with the respiratory symptoms complained of by some Plaintiffs.  Dr. Scheinman also ignores the many garment testing results she received that show either no formaldehyde, or levels of formaldehyde below the standard for direct skin contact that Dr. Scheinman cites as problematic, which includes test results commissioned by Plaintiffs.  *See Barber*, 17 F. App'x at 437 ("Because in formulating his opinion [expert] cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and *Daubert*, and it thus fails to 'assist the trier of fact.'").

Dr. Scheinman's testimony regarding alopecia is likewise of no value to the trier of fact. She states that "high" levels of mercury and "other heavy metals" in the uniforms caused alopecia "to a reasonable degree of medical probability."  Scheinman Report at 9.  Although Dr. Scheinman references "other heavy metals," mercury is the only metal that she cites as being present in testing of the uniform and also potentially a cause of hair loss.  *Id.*  Nowhere in her report does Dr. Scheinman state at what levels mercury can cause hair loss, by which means of exposure, or what levels of mercury Plaintiffs were, in fact, exposed to from their uniforms (if any).  Thus, Dr. Scheinman's opinions that the Lands' End uniform caused Plaintiffs' hair loss is based on unreliable methodology and should be excluded.

**B.      Dr. Scheinman's Methodology for Assessing Cause Is Not Reliable Even for the 15 Plaintiffs Whose Partial Medical Records She Did Review**

Even for the 15 Plaintiffs for whom Dr. Scheinman reviewed selectively chosen medical records, her causation opinions fail to meet the Seventh Circuit's standards for admissibility. First, even by Dr. Scheinman's own standards for determining cause the partial medical records she reviewed were not sufficient to determine cause (e.g., she did not review patch tests for all 15 Plaintiffs, conduct a physical exam, or review a medical history for any of the 15 Plaintiffs). Second, Dr. Scheinman failed to consider alternative for causation for any Plaintiff, including the 15 for whom she reviewed partial medical records. For those reasons, Dr. Scheinman's causation opinion should also be excluded as to the 15 Plaintiffs for whom she reviewed partial medical records.

Dr. Scheinman's review of partial medical records was unreliable to determine cause of any of the 15 Plaintiff's occupational contact dermatitis or any other alleged symptoms and her opinions must be excluded. At the outset, the manner in which the partial medical records Dr. Scheinman reviewed were chosen casts serious doubt on her methodology. At the time of Dr. Scheinman's report, medical records had been collected from the 14 Class Representative Plaintiffs. Dr. Scheinman reviewed counsel-selected records for six of those Plaintiffs, but did not review the vast majority of records that had been collected for those or any other Plaintiffs as of the date of her report. It is not clear if Dr. Scheinman knew that those Plaintiffs had extensive additional records available, but she testified that she had no role in choosing the documents she saw and did not ask for additional records for any of the Plaintiffs. Scheinman Dep. at 73:16–22, 127:1-22. These facts raise concerns about potential bias in how Plaintiffs' counsel selected the documents provided to Dr. Scheinman. Indeed, when Plaintiffs' counsel selects specific data for an expert to review and there is no apparent basis for the selection, there is no way for the court to assess the potential rate of error or presence of bias. *See Eghnayem v. Boston Sci. Corp.*, 57 F.

Supp. 3d 658, 673–74 (S.D. W. Va. 2014).  In such instances, courts exclude expert opinions derived from counsel's hand-picked samples.  *Id.* at 674.

Further, even if the 15 partial medical records constituted a representative sample (and there is no evidence that it did), Dr. Scheinman did not even attempt to apply the Mathias criteria on an individual basis for the 15 Plaintiffs whose partial medical records she reviewed.  Further, Dr. Scheinman testified that if she were evaluating a patient in her clinical practice, she would need to conduct further analysis and either speak to the patient or examine the patient herself before making a diagnosis or trying to determine causation.  *See supra* Section III.A.1.  Dr. Scheinman took none of those steps here.  For instance, of the 15 Plaintiffs for whom Dr. Scheinman reviewed counsel-selected partial records, four had respiratory symptoms.  It is improper to determine causation for respiratory symptoms by looking at only partial medical records, selected by counsel, without any further inquiry or any discussion with the patient.  *See Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th Cir. 2021) ("[T]he correct inquiry focuses not on 'the ultimate correctness of the expert's conclusions,' but rather on 'the soundness and care with which the expert arrived at her opinion.'") (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)).  As another example, Dr. Scheinman stated in her report that "many" of these Plaintiffs had patch testing results, which allowed her to determine that the uniform was the cause of their dermatological symptoms.  In fact, only four Plaintiffs had patch testing results to the Delta uniform.  *See* Fedoruk Report at Appendix C.

The dearth of patch testing data even among the 15 Plaintiffs for whom Dr. Scheinman reviewed certain medical records is illustrative of a further flaw in her analysis: failure to consider alternative causes.  According to Dr. Scheinman's testimony, patch testing can only establish that a Plaintiff has an allergy—it cannot establish that the allergy caused any specific symptom.

14

Scheinman Dep. at 50:1–18. ("Q. And so without more information all the patch test tells you is that have an allergy to those three things, but it doesn't tell you which one of those three things is the actual cause of the rash that you've been experiencing right now? A. That's true and [sic] times it is multifactorial."). And as Dr. Scheinman conceded, many of the symptoms that Plaintiffs complained of are common maladies with numerous potential causes, and it would be relevant to know whether the Plaintiffs had suffered from those symptoms in the past (which was not discernible from the limited medical records Dr. Scheinman reviewed). *Id.* at 106:15–107:9, 149:11–150:11. The Seventh Circuit has, time and again, made clear that arriving at a conclusion without any explanation or analysis does not satisfy *Daubert*, and an expert must at least consider and account for possible alternative explanations. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 787 (7th Cir. 2017) (affirming exclusion of expert in part because he "failed to account for other possible explanations in arriving at his conclusion"); *Brown*, 765 F.3d at 774 (affirming exclusion of expert for failing to investigate and rule out any serious alternative causes); *Clark*, 192 F.3d at 757 ("An expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless.") (internal quotation marks omitted).[8]

---

[8] Plaintiff Dana Smith provides a glaring example of Dr. Scheinman's failure to consider both pre-existing conditions and potential alternative causes. Ms. Smith was diagnosed with a number of auto-immune diseases prior to ever wearing the Lands' End uniform, including pernicious anemia, morphea (also known as localized scleroderma), hypothyroidism, and psoriasis. Dkt. No. 86 ("D. Smith Dep.") at 31:22–24. Known symptoms of those conditions include dry skin, rash, and fatigue. Williams Decl., Ex. B (collecting Mayo Clinic sources). Ms. Smith also has a number of allergies, including to compounds commonly included in many household items like shampoos, lycra, and shoe soles. D. Smith Dep. at 77:5–18, 103:22–104:11, 105:11–21. Dr. Scheinman reviewed partial medical records for Ms. Smith, but did not consider her many auto-immune disorders or allergies to common household products potential causes of any of her symptoms. On Dr. Scheinman's analysis, the cause of any symptoms is simply Ms. Smith's exposure to the uniform.

## V.     CONCLUSION

The decision to exclude Dr. Scheinman's testimony from this case should not be controversial, as Dr. Scheinman herself made clear in her deposition testimony that she would need to do far more to reliably opine on the cause of any of the symptoms for the 588 Plaintiffs for whom she reviewed no medical records.  And the same is true for the 15 Plaintiffs for whom she reviewed partial, counsel-selected medical records.  For all Plaintiffs, Dr. Scheinman failed to speak with, treat, or review their full medical records.  Her testimony is nothing more than her "suspicion," without data or analysis.  As a result, her testimony is not reliable and cannot survive challenge under *Daubert*.  This Court should exclude her testimony.

For the reasons stated above, Lands' End respectfully requests that the Court grant this Motion and exclude all expert testimony and opinions from Dr. Pamela Scheinman.

Dated: October 4, 2021    Respectfully submitted,

           LATHAM & WATKINS LLP

      By:  s/ U. Gwyn Williams
          U. Gwyn Williams (*pro hac vice*)
          Samuel A. Townsend (*pro hac vice*)
          Avery E. Borreliz (*pro hac vice*)
          200 Clarendon Street
          Boston, Massachusetts 02116
          Telephone: 617.948.6000
          Facsimile: 617.948.6001
          gwyn.williams@lw.com
          samuel.townsend@lw.com
          avery.borreliz@lw.com

          *Attorneys for Defendant*
          *Lands' End, Inc.*